**Joanne SIEGEL and Laura Siegel Larson, Plaintiffs,**

v.

**TIME WARNER INC., Warner Communications Inc., Warner Bros. Entertainment Inc., Warner Bros. Television Production Inc., and D.C. Comics, Defendants.**

Nos. CV–04–8776–SGL(RZX), CV–04–8000–SGL (RZx).

United States District Court, C.D. California.

July 27, 2007.

Marc Toberoff, Nicholas Calvin Williamson, Rafael Gomez–Cabrera, Marc Toberoff Law Offices, Los Angeles, CA, for Plaintiffs.

Michael Bergman, Anjani Mandavia, Adam Beriah Hagen, Weissmann Wolff Bergman Coleman Grodin & Evall, Beverly Hills, CA, James D. Weinberger, Roger L. Zissu, Fross Zelnick Lehrman & Zissu, Patrick T. Perkins, Perkins Law Offices, Cold Spring, NY, for Defendants.

## ORDER GRANTING DEFENDANTS' MOTION FOR RECONSIDERATION

LARSON, District Judge.

This case is the latest chapter in the continuing saga over who owns the copyright to "Superboy," the youthful persona of the iconic comic book super hero "Superman," spanning from the golden age of print media comics to the present-day revolution in digital media. Like the entire spectrum of graphics media technology, the law governing ownership rights to copyrights has changed dramatically, and it is precisely these changes in the law that bring this case to this Court.

Although the story of how Superman and later Superboy came into being has become the stuff of legend among comic book fans, the Court will recite it once more for those unfamiliar with the tale.

Jerome Siegel and Joseph Shuster are Superman's creators. In 1933, Siegel conceived of the idea of a comic strip featuring a character who is sent to Earth from a distant planet and, with superhuman powers, performs daring feats for the public good. Siegel named his character "Superman." Siegel discussed his idea with Shuster, an artist, and together they crafted a comic strip consisting of several weeks worth of material (both dialogue and artwork, some of the latter being completely "inked in" and ready for publication, and some consisting of no more than black-and-white pencil drawings) suitable for newspaper syndication embodying that idea. The two shopped the character around for a number of years to numerous publishers but were unsuccessful in having it published. In the meantime, Siegel and Shuster penned other comic book strips at their artist studio in Cleveland, Ohio, and sold them for publication, most notably "Slam Bradley" and "The Spy" to Nicholson Publishing Co., who purchased their material for resale to Detective Comics. When Nicholson folded shop in 1937, Detective Comics acquired some of its magazine properties, including the comic book strips penned by Siegel and Shuster.

The two entered into an agreement with Detective Comics on December 4, 1937, whereby they agreed to furnish some of the existing comic strips for the next two

years and further agreed "that all of these products and work done by [them] for [Detective Comics] during said period of employment shall be and become the sole and exclusive property of [Detective Comics] and [Detective Comics] shall be deemed the sole creator thereof. . . ." The agreement further provided that any new or additional features by Siegel and Shuster were to be submitted first to Detective Comics, who was given the initial option (to be exercised within sixty days after submission) to publish the material. Soon thereafter Detective Comics became interested in publishing Siegel and Shuster's now well-traveled Superman idea (but in an expanded 13–page comic book format), the interest eventually culminating with Superman's release in April, 1938, in the first volume of *Action Comics,* a new comic magazine issued by Detective Comics. The Superman comic strip became an instant success and Superman's popularity continues to endure to this day as his depiction has been transferred to varying media formats.

On March 1, 1938, before Superman's publication, Siegel and Shuster assigned to Detective Comics "all [the] good will attached . . . and exclusive right[s]" to Superman in exchange for $130. This assignment in ownership rights was later confirmed in a September, 22, 1938, employment agreement in which Siegel and Shuster acknowledged that Detective Comics was "the exclusive owners" of not only the other comic strips they had penned earlier for Nicholson (and continued to pen for Detective Comics) but Superman as well; that they would continue to supply the art work and storyline (or in the parlance of the trade, the "continuity") for said comics at varying per page rates depending upon the comic in question (Superman being paid at the highest rate offered of $10 per page) for the next five years; that Detective Comics had the "right to reasonably supervise the editorial

matter" of those existing comic strips; that Siegel and Shuster would not furnish "any art or copy . . . containing the . . . characters or continuity thereof or in any wise similar" to said comic strips to a third party; and Detective Comics would have the right of first refusal (to be exercised within a six week period after the comic's submission) with respect to any future comic strip creations conceived by Siegel or Shuster:

> In the event you shall do or make any other art work or continuity suitable for use as comics or comic strips, you shall first give us the right to first refusal thereof by submitting said copy and continuity ideas to us. We shall have the right to exercise that option for six weeks after submission to us at a price no greater than offered to you by any other party.

Not long thereafter, on November 30, 1938, Siegel pitched the idea to Detective Comics of serializing a comic concerning the exploits of Superman as a young man. Siegel called his character "Superboy." As Siegel explained the synopsis for the new comic strip:

> Superboy . . . would relate the adventures of Superman as a youth. . . . I'd like the strip to have a large number of pages, such as 13 so that I could develop it as well as Superman. . . . Tho the strip would feature super-strength, it would be very much different from the Superman strip inasmuch as Superboy would be a child and the type of adventures very much different. There'd be lots of humor, action, and the characters would be mainly children of about 12–years rather than adults. Also, inasmuch as this strip will probably be used as a newspaper feature, I should think that you would want to own all rights to it by having it first appear in your magazine.

Detective Comics, by a letter dated December 2, 1938, effectively declined to publish Siegel's proposed Superboy comic. Siegel later re-pitched the idea in December, 1940, through the submission of a lengthy script containing the storyline and dialogue for the proposed comic strip's first release or releases that fleshed out in greater detail the outlines of the Superboy story arch. Detective Comics again effectively declined to publish Superboy.

Siegel entered the United States Army in July, 1943, to serve his country during World War II. In December, 1944, while Siegel was stationed abroad, Detective Comics published, without notice to Siegel and without his consent, an illustrated five-page comic strip entitled "Superboy" appearing as one among many other comics strips in the body of volume 101 of its magazine *More Fun Comics*. The illustrations for the first Superboy comic strip were done by Shuster at the direction of Detective Comics. When Detective Comics published volume 101 to *More Fun Comics* it also secured a copyright in all the contents of the same under Copyright Registration No. B653651. Thereafter Detective Comics continued to publish (and Shuster for a period of time continued to illustrate) "Superboy" comic strips, first in its serialized magazine *More Fun Comics*, then in *Adventure Comics*, and eventually as a stand-alone feature in the self-titled comic book *Superboy*.

Detective Comics' publication of Superboy increased an already growing rift between the parties predicated largely upon Siegel and Shuster's conclusion that Detective Comics had not paid them their fair share of profits generated from the exploitation of their Superman creation, as well as the profits generated from characters like Superboy, which had his roots in the original Superman character. As a result, in 1947, Siegel and Shuster brought an action against Detective Comics' successor, National Periodical Publications, Inc., in New York Supreme Court, Westchester County, seeking to annul and rescind their previous agreements with Detective Comics as void for lack of mutuality and consideration. As part of the suit Siegel argued that Detective Comics had no right to publish his "Superboy" creation.

Towards that end, the third cause of action in the New York state court complaint asserted that the release of the Superboy comic strip in *More Fun Comics*, no. 101, "was based entirely upon the synopsis submitted" by Siegel to Detective Comics, "and contained in detail the same characters, incidents and plot" in the synopsis. (Defs' App. of Docs. in Supp. Mot. Recons., Ex. 7 at ¶ 30). The complaint further alleged that Detective Comics' publication of Superboy was done "without the consent of" and without payment to Siegel. (Defs' App. of Docs. in Supp. Mot. Recons., Ex. 7 ¶¶ 31, 33). These points were important as the third cause of action averred that Siegel's Superboy submissions belonged to him alone in light of Detective Comics' failure to exercise its right of first refusal under the parties' September, 1938, contract. (Defs' App. of Docs. in Supp. Mot. Recons., Ex. 7 ¶¶ 28–29). Essentially, the third cause of action pled that Detective Comics had stolen Siegel's Superboy idea. (Defs' App. of Docs. in Supp. Mot. Recons., Ex. 7 ¶ 31 (averring that Detective Comics' publication of Superboy "use[d] and was based upon the conception and idea as submitted in writing and detail by the plaintiff, SIEGEL")).

In the alternative, the fourth cause of action in the complaint alleged that the "plot, conception and incidents" contained in Detective Comics' Superboy publication "were based upon and copied from the plot, conception and incidents" of Siegel and Shuster's *Superman* character, and that such misassociation between Siegel's

Superman creation and Detective Comics' Superboy was exacerbated by Detective Comics affixing, without Siegel's consent, his name as the author to each of the Superboy releases. (Defs' App. of Docs. in Supp. Mot. Recons., Ex. 7 ¶¶ 36, 37). In so publishing Superboy, it was alleged Detective Comics had "deceived the public" into believing that Siegel "was the author of the continuity dialogue and action of each of the individual releases" when in fact he "was not the author." (Defs' App. of Docs. in Supp. Mot. Recons., Ex. 7 ¶ 36). Labeling such publication as "wrongful," the fourth cause of action alleged that such unauthorized misassociation between the two was "injurious" to Siegel's reputation. (Defs' App. of Docs. in Supp. Mot. Recons., Ex. 7 ¶ 38).

The complaint sought an accounting of the profits generated from Superboy's publication and that further publication of Superboy be enjoined. (Defs' App. of Docs. in Supp. Mot. Recons., Ex. 7 at page 29–30).

After a trial, official referee J. Addison Young, in an opinion dated November 21, 1947, concluded that the March 1, 1938, assignment of the rights to Superman to Detective Comics was valid and supported by consideration, and that, therefore, Detective Comics was the exclusive owner of "all" the rights to Superman. (Defs' App. of Docs. in Supp. Mot. Recons., Ex. 8 at 371). With respect to Superboy, the referee found that it was solely Siegel's creation; that Superboy was a work distinct from Superman (thus falling within the right of first refusal provision contained in the parties' September 22, 1938, agreement); and that, on account of Detective Comics' failure to exercise its option to publish Superboy when first presented with the idea, the rights to Superboy belonged to Siegel. As explained by the referee:

It is quite clear to me, however, that in publishing Superboy the Detective Comics, Inc. acted illegally. I cannot accept defendants view that Superboy was in reality Superman. I think Superboy was a separate and distinct entity. In having published Superboy without right, plaintiffs are entitled to an injunction preventing such publication and under the circumstances I believe the defendants should account as to the income received from such publication and that plaintiffs should be given an opportunity to prove any damages they have sustained on account thereof.

(Decl. Marc Toberoff, Ex. N at 323–24).

Shortly thereafter, on April 12, 1948, the referee signed a thirty-six page findings of fact and conclusions of law expanding upon the statements contained in the opinion he had tendered earlier. The factual findings pertinent to Superboy were as follows:

156. On or about November 30, 1938, the plaintiff SIEGEL, in writing and by mail, submitted to DETECTIVE COMICS, INC. for its consideration and acceptance or rejection, for publication, under the terms of the contract dated September 12, 1938, . . . a synopsis or summary of the idea and conception and plan of a new comic strip to be known as SUPERBOY[, which would narrate the adventures of SUPERMAN as a youth].

157. On December 2, 1938, DETECTIVE COMICS, INC. deferred consideration of a SUPERBOY comic strip until some future time.

158. DETECTIVE COMICS, INC. did not within six weeks indicate its election to publish the said new comic strip SUPERBOY.

159. DETECTIVE COMICS, INC. on or about December 2, 1938, by its letter in writing to the plaintiff SIEGEL did elect not to publish the said comic strip

SUPERBOY under the terms of the contract dated September 22, 1938, . . . .

160. During the month of December, 1940, the plaintiff SIEGEL submitted to DETECTIVE COMICS, INC. for its further consideration a complete script or scenario, containing the continuity, plan and dialogue for the first "release" or "releases" of the proposed new comic strip SUPERBOY, and that the said synopsis contained within itself the entire plan for the future publication of the said comic strip SUPERBOY and the conception of the character SUPERBOY, all set forth with detail and particularity.

162. DETECTIVE COMICS, INC. did not within six weeks after the submission of the said script or scenario indicate its election to publish the said comic strip SUPERBOY.

163. Thereafter and during December of 1944 DETECTIVE COMICS, INC. did publish a certain comic strip release entitled SUPERBOY in a magazine entitled "More Fun Comics."

164. The said comic strip release entitled SUPERBOY embodied and was based upon the idea, plan and conception contained in the plaintiffs, SIEGEL's letter to DETECTIVE COMICS, INC. dated November 30, 1938 . . . .

165. The said release of the said comic strip SUPERBOY published in December of 1944 embodied and was based upon the idea, conception and plan contained in the script or scenario submitted by the plaintiff SIEGEL to DETECTIVE COMICS, INC. in December of 1940 . . . .

166. Said first thirteen pages of SUPERMAN material [in *Action Comics* no. 1] did not contain the plan, scheme, idea or conception of the comic strip SUPERBOY as it was later submitted by the plaintiff SIEGEL to DETEC-TIVE COMICS, INC. [in the 1938 pitch or the later 1940 script].

167. Said first thirteen pages of SUPERMAN material [in *Action Comics* no. 1] did not contain the plan, scheme, idea or conception of the comic strip SUPERBOY as published by DETECTIVE COMICS, INC . . . . from December, 1944, until the date of the trial herein.

168. The said publication was without the permission of the plaintiff SIEGEL.

171. All of the comic strip material published under the title SUPERBOY was based upon the idea, plan, conception and direction outlined in the [1938 pitch].

172. All of the comic strip material published under the title SUPERBOY was based upon the idea, plan, conception and direction contained in the scenario or script . . . submitted by the plaintiff SIEGEL to DETECTIVE COMICS, INC. [in 1940].

173. The publication of all comic strip material entitled SUPERBOY was at all times without the permission of the plaintiff SIEGEL.

174. Plaintiff SIEGEL has received no payment on account of the publication of any of the material entitled SUPERBOY.

175. All publications of SUPERBOY by DETECTIVE COMICS, INC. from April, 1945 until . . . the date of the trial herein, contained affixed thereto the name of the plaintiffs SIEGEL and SHUSTER.

176. The use of the name of the plaintiff SIEGEL . . . was without the consent of the plaintiff SIEGEL.

179. Defendant INDEPENDENT NEWS CO., INC. knowing of the rights of the plaintiff SIEGEL, under the [September 22, 1938, contracts], sold and distributed to newsdealers for resale to

the public throughout the United States, magazines containing the material entitled SUPERBOY as hereinafter described and set forth.

180. All the art work for the SUPERBOY releases was prepared by plaintiff SHUSTER under the direction of DETECTIVE COMICS, INC.

181. Plaintiff SHUSTER was paid in full by DETECTIVE COMICS, INC. or defendant NATIONAL COMICS PUBLICATIONS, INC. for all the art work furnished by him in connection with said SUPERBOY comic strip releases.

182. At the time that publication of the SUPERBOY comic strip was commenced, plaintiff SIEGEL was unavailable to furnish any of the continuity therefor being absent in military service.

183. Upon the return of plaintiff SIEGEL to civilian status in January, 1946, DETECTIVE COMICS, INC. entered into negotiations with him regarding SUPERBOY, proposing certain payments to him and affording him the opportunity of supplying the continuity for SUPERBOY releases.

184. No agreement was reached between Detective COMICS, INC. and plaintiff SIEGEL as a result of the aforesaid negotiations; however, defendant NATIONAL COMICS PUBLICATIONS, INC. has offered to pay plaintiff SIEGEL for SUPERBOY releases heretofore published, the same rate as he was paid for SUPERMAN magazine releases for which he did not furnish the continuity, i.e., at the rate of $200 per release of standard length of thirteen pages.

(Decl. Marc Toberoff, Ex. O at 355–58).

In conjunction therewith, the referee also made the following conclusions of law: "Plaintiff Siegel is the originator and the sole owner of the comic strip feature SUPERBOY, and ... that the defendants ... are perpetually enjoined and restrained from creating, publishing, selling or distributing any comic strip material of the nature now and heretofore sold under the title SUPERBOY.... Plaintiff Siegel, as the originator and owner of the comic strip feature SUPERBOY has the sole and exclusive right to create, sell and distribute comic strip material under the title SUPERBOY." (*Id.* at 365–66). Thereafter both sides filed an appeal from the referee's findings of fact and conclusions of law. (Decl. Marc Toberoff, Ex. Q at 379).

While the matter was still on appeal, the parties reached a settlement on May 19, 1948, and signed a stipulation which called for the payment of over $94,000 to Siegel and Shuster. In addition, the stipulation provided that the referee's findings were to be vacated in all respects; reiterated the referee's earlier determination that Detective Comics owned the rights to Superman; and contained the following proviso concerning the ownership rights to Superboy: "Defendant NATIONAL COMICS PUBLICATION, INC. is the sole and exclusive owner of and has the sole and exclusive right to the use of the title SUPERBOY and to create, publish, sell and distribute and to cause to be created, published, sold and distributed cartoon or other comic strip material containing the character SUPERBOY...." (Decl. Marc Toberoff, Ex. P at 374).

Two days later, on May 21, 1948, the referee entered a final consent judgment that, among other things, vacated the referee's findings of fact and conclusions of law entered on April 12, 1948, and expressly acknowledged that Detective Comics is the "sole and exclusive owner of and has the sole and exclusive right to the use of the title SUPERBOY." (Decl. Marc Toberoff, Ex. Q at 379, 382).

The expiration of the initial copyright term for Superman in the mid–1960s led to another round of litigation between the

parties.[1] In 1969 Siegel and Shuster filed suit in federal district court in New York seeking a declaration that they, and not Detective Comics' successor, National Periodical Publications, Inc., were the owners of the copyright renewal rights to Superman. *See Siegel v. National Periodical Publications, Inc.,* 364 F.Supp. 1032 (S.D.N.Y.1973), *aff'd by,* 508 F.2d 909 (2nd Cir.1974). In the process of analyzing their claim, both the federal district court and later the Second Circuit made mention of both the referee's April, 1948, vacated findings as well as the parties' May, 1948, final consent judgment. *See* 364 F.Supp. at 1035, 508 F.2d at 912–13. The courts, however, diverged as to which of the various court documents coming out of the Westchester action should have binding effect.

The district court found *both* the referee's vacated findings as well as the final consent judgment to be binding upon it, *see* 364 F.Supp. at 1035 ("we note that the findings of the State Supreme Court in the Westchester action are binding upon us here. The terms of the stipulation of settlement in that action, and the consent judgment are also binding"), whereas the Second Circuit only made mention of the binding effect that the final consent judgment had on the case. *See* 508 F.2d at 913 ("There is no doubt that the [May 21, 1948,] judgment of the state court is binding in this subsequent federal action"). Both courts, however, concluded, in conformity with Supreme Court precedent at the time, *see Fred Fisher Music Co. v. M. Witmark & Sons,* 318 U.S. 643, 656–59, 63 S.Ct. 773, 87 L.Ed. 1055 (1943) (holding that renewal rights were assignable by an author during the initial copyright term,

before the renewal right vested), that, in transferring "all their rights" to Superman to Detective Comics pursuant to the final consent judgment, Siegel and Shuster had assigned not only Superman's initial copyright term but the renewal term as well, even though those renewal rights had yet to vest when the consent judgment was entered. *See* 364 F.Supp. at 1037–38, 508 F.2d at 913–14.

Thus ended the tale of the battle over the ownership to the copyrights to Superman and, by extension, Superboy. Or at least that was what everyone believed at the conclusion of the Second Circuit litigation.

With the passage of the Copyright Act of 1976 (the "1976 Act"), Congress changed the legal landscape concerning author's transfers of their copyrights in their creations. The 1976 Act expanded the duration of the renewal period for existing works already in their renewal term at the time of the Act for an additional nineteen years, *see* 17 U.S.C. § 304(b), and, more importantly for this case, gave authors the ability to terminate any prior grants of the rights to their creations that were executed before January 1, 1978, irrespective of the terms contained in such assignments, *e.g.,* that all the rights (the initial and renewal) belonged exclusively to the publisher. Specifically, section 304(c) to the Act provides that, "[i]n the case of any copyright subsisting in either its first or renewal term on January 1, 1978, other than a copyright in a work made for hire, the exclusive or nonexclusive grant of a transfer or license of the renewal copyright or any right under it, executed before January 1, 1978, ... is subject to

---

1. Under the Copyright Act of 1909 (the "1909 Act"), in effect at the time of Siegel and Shuster's creation of Superman and later assignment of the same to Detective Comics, an author was entitled to a copyright in his work for twenty-eight years from the date of its publication. *See* 17 U.S.C. § 24, *repealed by* Copyright Act of 1976, 17 U.S.C. § 101 *et seq.* Upon expiration of this initial twenty-eight year term, the author could renew the copyright for a second twenty-eight year period (the "renewal term").

termination .... notwithstanding any agreement to the contrary...."

It is this right to termination that Joanne Siegel, Jerome Siegel's widow, and Laura Siegel Larson, his daughter, now seek to employ in this case. In November, 2002, they served a notice of termination to defendants[2] directed solely at works featuring Superboy, claiming to undo as of November 17, 2004, any grant provided by Jerome Siegel to defendants' predecessors in interest contained in the May 19, 1948, stipulation.[3] The present suit by Joanne Siegel and Laura Siegel Larson seeks a declaration from this Court that the Superboy termination notice is valid and that they have recaptured all of the copyright to Superboy since the effective date of the termination.

This question—the validity of the termination notice—was addressed in a March 24, 2006, Order, by the Honorable Ronald S.W. Lew of this Court, which held: (1) The referee's findings from the 1948 Westchester action were binding, notwithstanding their vacatur; (2) the referee's findings conclusively determined certain unique and exclusive copyright issues, namely, that Siegel's Superboy submissions were later "published" (as that term is used in copyright law) in Detective Comics' *More Fun Comics # 101*, and that the Superboy submissions were neither a "work for hire," a "derivative work" of Superman, or a "joint work" between Siegel and Shuster; and (3) the termination notice was otherwise valid pursuant to the terms of the 1976 Act and the regulations promulgated thereunder. The end result of the March 24, 2006, Order was that Joanne Siegel and Laura Siegel Larson had recaptured the copyright to Superboy, leaving for trial whether defendants (notably, by producing and broadcasting the successful WB television series *Smallville*) had infringed Superboy's copyright since the effective termination date and the scope of accounting for the profits defendants had reaped in exploiting the copyright subsequent to the termination date. Thereafter, defendants' request to certify the Order for an interlocutory appeal was denied.

On October 30, 2006, the matter was reassigned to the present judicial officer, and defendants promptly sought reconsideration of the March 24, 2006, Order, and the decision to deny certifying the matter for an interlocutory appeal. For the reasons set forth below, the Court **GRANTS** defendants' motion for reconsideration of the March 24, 2006, Order.

The legal questions at stake in the present motion are two-fold:

(1) Whether the referee's vacated findings from the Westchester action have any binding effect in this case as a matter of judicial or collateral estoppel;[4] and,

---

**2.** The defendants consist of Detective Comics' successor in interest, DC Comics, and DC Comics' parent company, Time Warner, Inc., ("Time"), and Time's subsidiaries, Warner Communications, Inc., Warner Brothers Entertainment, Inc., and Warner Brothers Television Production, Inc. (collectively "defendants").

**3.** Plaintiffs have also brought an action, *Joanne Siegel, et al. v. Warner Brothers Entertainment, et al.*, CV–04–8400–SGL (RZx), seeking the Court to declare that they have effectively terminated and recaptured the assignment of the Superman copyrights to defendants that took place by operation of the

1938 agreements executed by Siegel and Shuster with Detective Comics.

**4.** Notably, the related doctrine of *res judicata* (or claim preclusion) has no application in this case given the claim for terminating prior copyright grants contained in the 1976 Act did not exist at the time of the Westchester action. *See Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 287–88 (2nd Cir.2002). In *Marvel*, the publisher argued that the co-creator of the late Captain America was barred, as a matter of *res judicata*, from exercising his termination right under the 1976 Act because, in a settlement agreement reached between the parties during a prior action in New York

(2) If they do have a preclusive effect, whether those findings foreclose further consideration of or otherwise impact, certain questions at issue in this case that are unique to copyright law. More to the point, the issue focuses on whether the referee's findings preclude further litigation on whether, as a matter of copyright law, (a) Siegel's submissions outlining the idea (and indeed the storyline and dialogue) for Superboy were later "published" in volume 101 of *More Fun Comics*; (b) the submissions were done under the auspices of a "work for hire"; (c) the submissions are nothing more than a derivative work based upon Superman with no original copyrightable elements contained therein; and (d) Siegel is the sole author of the work or whether the work is a "joint work" containing Siegel's storyline and Shuster's illustrations.

Ultimately, the Court concludes that, in conformity with the March 24, 2006, Order, the referee's findings must be given preclusive effect, but as a matter of *collateral* estoppel rather than *judicial* estoppel; however, contrary to the March 24, 2006, Order, those findings are not necessarily determinative of all the issues specified above, but require independent application of the governing body of copyright law to those findings to render a decision about the same.

## I. ARE THE REFEREE'S VACATED FINDINGS BINDING AS A MATTER OF JUDICIAL ESTOPPEL?

■ In the process of passing on the plaintiffs' motion for partial summary judgment, the Court's March 24, 2006, Order held that the referee's vacated findings should be given preclusive effect on account of defendants' predecessors taking an inconsistent position as to those findings' binding nature during the 1970s Superman litigation in the Second Circuit:

Defendants' current argument that Judge Young's findings are not binding contradicts the position taken by their predecessors in interest in the 1973 litigation and the 1974 Second Circuit appeal regarding Superman. In applying the doctrine of res judicata in favor of defendants, Judge Lasker precluded, and the Second Circuit affirmed, plaintiffs from litigating the issue of ownership of the renewal period of the Superman copyrights.

Having relied on Judge Young's findings for previous favorable determinations regarding Superman, defendants now take the inconsistent position that

state court in the 1960s, the co-creator acknowledged his contribution was done as work for hire. According to the publisher, there was "no meaningful distinction between the authorship issue raised in the prior action and the termination right at issue." *Id.* at 286. The Second Circuit disposed of the publisher's argument, commenting that neither "the termination right" contained in the 1976 Act nor the relief requested in the current case (termination of a prior valid grant of a copyright in one's creation) existed at the time of the prior state court action. *Id.* at 287. The court did acknowledge, however, that although *res judicata* could not bar the co-creator from exercising the claim to terminate rights under the 1976 Act, principles of collateral estoppel (or issue preclusion) may

still apply to bar litigation of certain issues that were actually decided in the prior action, including whether the co-creator's contribution to the comic was done as a work for hire:

Marvel also argues, correctly, that despite the enactment of the 1976 Act, the 1909 Act governs the authorship of the Works at issue here. However, it does not follow, as Marvel suggests, that since the Work's authorship was at *issue* in the previous actions, Simon's termination *claim* is precluded here. While Simon's assertion of authorship is the *sine qua non* of both his prior claim to renewal rights and his present claim to termination rights, it is merely an *issue* that determines the validity of each claim.

*Id.* at 288 (emphasis in original).

this Court is not bound by the state court findings, as they relate to Superboy. Defendants attempt to raise genuine issues of material fact, where the facts were clearly determined by Judge Young after the opportunity to take evidence and hear testimony on that evidence from the parties directly involved in creating this relationship.

Contrary to defendants' assertions now, both the Southern District of New York and the Second Circuit looked directly to, even citing to, Judge Young's findings of fact. This Court holds that it is consistent to continue this position and will look to Judge Young's findings as binding where relevant.

(Decl. Marc Toberoff, Ex. A at 9–10). Although not explicitly using the term, the Court's March 24, 2006, Order clearly invoked the doctrine of judicial estoppel. The Order specifically pointed to the fact that defendants' predecessor had sought to utilize the preclusive effect of the referee's vacated findings in connection with the 1970s Superman litigation and noted that such a position is fundamentally inconsistent with their present position that those same findings have no preclusive effect with respect to Superboy. Such a concern—preventing parties from seeking to take inconsistent legal positions in subsequent proceedings from those taken in earlier ones—is the hallmark feature of judicial estoppel. *See New Hampshire v. Maine*, 532 U.S. 742, 749–750, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001); *Rissetto v. Plumbers & Steamfitters Local 343*, 94 F.3d 597, 600 (9th Cir.1996). As one respected treatise noted, "Judicial estoppel is an equitable concept intended to prevent the perversion of the judicial process. It is to be applied where intentional self-contradiction is being used as a means of obtaining unfair advantage." 18 James Wm. Moore, Moore's Federal Practice § 134.30 at 134–63 to 134–64 (3rd ed.2006)

(internal quotation marks and citations omitted).

That the doctrine is equitable in nature does not mean its application is unlimited. The Supreme Court has set out three questions to guide a court's decision whether to apply the doctrine in a given case: (1) Is the party's later position clearly inconsistent with its earlier position?; (2) Did the party succeed in persuading a court to accept its earlier position?; and (3) Would the party derive an unfair advantage or impose an unfair detriment on the opposing party were the court to allow it to pursue its now inconsistent position? *New Hampshire*, 532 U.S. at 750–51, 121 S.Ct. 1808.

Applying this test here, the Court readily finds that defendants' present position is clearly inconsistent with the one taken in the 1970s Superman litigation. Defendants unquestionably sought to have the federal courts in that litigation bar Siegel and Shuster's claim to the renewal rights to the Superman copyright by reference, in part, to the referee's vacated findings. Now they argue that those very findings have no preclusive effect. The first factor, therefore, weighs in favor of application of judicial estoppel.

■ The second factor, whether defendants succeeded in having those courts accept their position, is more problematic. Although at least one of those courts did conclude that the referee's vacated findings were binding, *see* 364 F.Supp. at 1035; the difficulty lies in the fact that this particular legal point was not material to the outcome in the case. Given that the referee's vacated findings and the parties' final consent judgment were consistent with one another as to the ownership of Superman, the federal courts during the 1970s Superman litigation were not called upon to take a position, one way or the other, over the legally binding nature of the referee's va-

cated findings separate and apart from the parties' final consent judgment. Both the findings and the consent judgment supported those courts' decisions that defendants were the owners of the renewal term to the Superman copyright.

Here, in contrast, the separate legally binding nature of the referee's vacated findings is very much in dispute because those findings are in direct conflict with the parties' final consent judgment over the ownership rights to Superboy. In light of the fact that the federal courts in the earlier Superman litigation did not have to accept (and one in fact did not accept) defendants' earlier inconsistent position in order to rule in defendants' favor in the manner in which they did, it is hard to fathom how allowing defendants to now take a contrary position in this litigation somehow operates to create the perception that either of the courts deciding the 1970s Superman litigation, or this Court for that matter, have been misled through defendants inconsistent positions. *See New Hampshire*, 532 U.S. at 750, 121 S.Ct. 1808 (noting that result sought to be avoided by second factor is the creation of "the perception that either the first or the second court was misled"). As one court explained:

> [J]udicial estoppel is an "extraordinary remed[y] to be invoked when a party's inconsistent behavior will otherwise result in a miscarriage of justice." It is not meant to be a technical defense for litigants seeking to derail potentially meritorious claims, especially when the alleged inconsistency is insignificant at best and there is no evidence of intent to manipulate or mislead the courts. Judicial estoppel is not a sword to be wielded by adversaries unless such tactics are necessary to "secure substantial equity."

*Ryan Operations G.P. v. Santiam–Midwest Lumber Co.*, 81 F.3d 355, 365 (3rd Cir.1996).

■ The third factor weighs against application of judicial estoppel for much the same reason. No miscarriage of justice or substantial inequity would take place from allowing defendants to now take a position inconsistent with that taken during the 1970s Superman litigation precisely because the prior contrary position was itself immaterial to the outcome in those prior proceedings. *See New Hampshire*, 532 U.S. at 750–51, 121 S.Ct. 1808 ("Absent success in a prior proceeding, a party's later inconsistent position introduces no 'risk of inconsistent court determinations' and thus poses little threat to judicial integrity"). No matter how the federal courts in the Superman litigation parsed the matter, be it pursuant to the referee's vacated findings, the parties' final consent judgment, or both, the conclusion reached would be the same: Defendants were the owners to the renewal term to the Superman copyright. It is not inequitable to allow defendants to now take a position inconsistent with one taken in a prior litigation if the conclusion reached in that prior litigation would have been the same regardless of the defendants' advocated position.

Judicial estoppel is guided by pragmatic considerations geared towards "the facts of the particular dispute in mind"; it is not meant as "a set of hard and fast rules that might be circumvented by a clever litigant, on the one hand, or serve as a trap for an unwary litigant, on the other." 18 JAMES WM. MOORE, MOORE'S FEDERAL PRACTICE § 134.31 at 134–72 (3rd ed.2006). Just because defendants took an inconsistent position in the past on a point that was not material to the outcome of that litigation does not mean they are bound to that position forevermore. Accordingly, the Court finds the March 24, 2006, Order's reliance on the doctrine of judicial estoppel is misplaced.

## II. ARE THE REFEREE'S VACATED FINDINGS BINDING AS A MATTER OF COLLATERAL ESTOPPEL?

■ This leaves whether the referee's vacated findings are binding through operation of collateral estoppel.

■ Federal courts must give a state court judgment the same preclusive effect as would be given to that judgment "under the law of the State in which the judgment was rendered." *Migra v. Warren City Sch. Dist. Bd. of Ed.*, 465 U.S. 75, 81, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984); *see also Marrese v. American Academy of Orthopaedic Surgeons*, 470 U.S. 373, 380, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985) ("a federal court should determine the preclusive effect of a [earlier] state court judgment [through reference] to the law of the State in which judgment was rendered"); *Pension Trust Fund v. Triple A Mach. Shop*, 942 F.2d 1457, 1460 (9th Cir.1991) (examining California law for purposes of determining *res judicata* effect of an earlier California state court judgment). Thus, in determining the preclusive effect of the vacated findings from the 1948 Westchester action, the Court must look to New York law.

■ Under New York law, collateral estoppel applies when (1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits. *See Mercantile & General Reinsurance Co. v. Colonial Assurance Co.*, 147 Misc.2d 804, 805–806, 556 N.Y.S.2d 183 (N.Y.Sup.Ct. 1989) ("Collateral estoppel ... requires that there have been a final, binding determination in a prior action in which there was a full and fair opportunity to litigate the issue involved"); *see also Marvel*, 310 F.3d at 288–89 (setting forth the above elements for collateral estoppel under New York law). The result achieved through invocation of collateral estoppel is to prevent parties or their privies, such as defendants in this case, from re-litigating in a subsequent action an issue of fact or law that was fully and fairly litigated in a prior proceeding.

■ Defendants position on this point is fairly straightforward: The referee's findings were vacated by the parties' May, 19, 1948, stipulation and the subsequent entry of the final consent judgment; with this vacatur, so too lapsed the binding effect of the referee's findings because no final judgment was left in place to enforce. Defendants correctly note that, under New York law, a judgment that has been vacated loses its preclusive effect. *See Ruben v. American and Foreign Ins. Co.*, 185 A.D.2d 63, 592 N.Y.S.2d 167, 169 (N.Y.App.Div.1992) ("Because the judgment was vacated, the jury verdict lacks finality and cannot be given collateral estoppel effect"); *Church v. New York State Thruway Authority*, 16 A.D.3d 808, 791 N.Y.S.2d 676, 679 (N.Y.App.Div.2005) ("when the judgment is subsequently vacated, collateral estoppel is inapplicable"); *see also Universal City Studios, Inc. v. Nintendo Co.*, 578 F.Supp. 911, 919 (S.D.N.Y.1983) ("A judgment that has been vacated, reversed, or set aside on appeal is thereby deprived of all conclusive effect, both as res judicata and as collateral estoppel").

That said, courts outside of New York have recognized an exception to this rule and have given preclusive effect to vacated judgments if those judgments were the product of a trial and there is a significant lapse of time between the proceedings. *See Aetna Casualty & Surety Co. v. Jeppesen & Co.*, 440 F.Supp. 394, 405 (D.Nev. 1977); *Angstrohm Precision, Inc. v. Vi-*

*shay Intertechnology, Inc.,* 567 F.Supp. 537, 541 (E.D.N.Y.1982) (construing Virginia law); *see also Ringsby Truck Lines v. Western Conference of Teamsters,* 686 F.2d 720, 722 (9th Cir.1982) (noting that the answer to whether to give preclusive effect to a trial court's judgment after the parties settle the case while the matter is on appeal "may be different in different cases as equities and hardships vary the balance between the competing values of right to relitigate and finality of judgment" *citing* RESTATEMENT (SECOND) OF JUDGMENTS § 28 (1982)).

There appears to be no authority conclusively determining whether such an exception exists under New York law. In one New York state case, *Mercantile & General Reinsurance Co. v. Colonial Assurance Co.,* 147 Misc.2d 804, 556 N.Y.S.2d 183 (N.Y.Sup.Ct.1989), the court did, however, make mention of the possibility of giving such preclusive effect to vacated judgments in circumstances not all that different from those in this case.

Then Justice (now federal district court judge) Harold Baer, Jr., issued a comprehensive ruling examining the very question now in dispute in this case. In *Mercantile,* a reinsurer sought a declaratory judgment that it was not bound to provide reinsurance with respect to certain insurance policies. *Id.* at 805, 556 N.Y.S.2d 183. The reinsurer's obligations had been previously litigated in a prior New York state court action involving the same insurance and reinsurance contracts, which resulted in the grant of partial summary judgment against it. *Id.* While the matter was on appeal the parties settled. *Id.* As an element of the settlement, the trial court issued an order vacating the judgment and sealing the record. *Id.*

The question before Justice Baer was whether the vacated judgment from the prior action collaterally estopped the reinsurer from seeking to relitigate those issues in the case before him. He began his analysis by noting the general rule that "a judgment that has been vacated will not provide a basis for collateral estoppel." *Id.* at 806, 556 N.Y.S.2d 183. The court then noted that some courts outside of New York, while recognizing this general rule, had recognized that it may not "apply when the vacatur has occurred after 'the expenditure of the court's resources in a jury trial.'" *Id.* at 807, 556 N.Y.S.2d 183. Although the expenditure of such judicial resources had not occurred in the case before him, Justice Baer nonetheless chose to address the question, explaining that it appeared to be one of "first impression" under New York law. *Id.*

In examining this question Justice Baer recognized that competing considerations affected the analysis. On the one hand, weighing in favor of continuing to afford preclusive effect to the vacated judgment, was the public's interest in the conservation of judicial resources. The more "resources of a hard-pressed judicial system [are] expended in resolving a matter," the more significant this factor becomes in preserving the results generated by that system. *Id.* at 808, 556 N.Y.S.2d 183.

On the other hand, weighing against giving preclusive effect to a vacated judgment, is not only the private interest expressed by the parties themselves not to be bound by that judgment, but the court's similar conclusion in the prior action as well. As Justice Baer observed, "[h]ad the judge wished to allow preclusion, he could have dismissed [the case] rather than vacat[ing the findings as well]." *Id.* at 808, 556 N.Y.S.2d 183. Additionally, there is the public interest in facilitating settlement by the parties, an interest which would be undermined if the effects of such settlement (notably, the agreement to vacate earlier court orders) was negated. *Id.* at 809, 556 N.Y.S.2d 183 ("There M &

G gave up its appeal on the basis of the settlement. It did so in reasonable reliance on the basic principle that a vacated judgment is of no effect"). The negative result of undermining the ability of parties to effectively settle their disputes would also spill over into parties litigating every possible issue in any "case in which there was any chance of a later suit."

> Every move possible and every countermove imaginable would become imperative. Every appealable ruling would have to be appealed. The system—and therefore the public interest—would suffer from this increase in the volume and ferocity of litigation.

*Id.* at 809, 556 N.Y.S.2d 183.

In the end, Justice Baer returned to where he began his analysis, finding that none of the "exceptional circumstances" that may weigh in favor of giving preclusive effect to a vacated judgment existed in the case before him. The expenditure of judicial resources in the prior action was limited, as the prior judgment was entered as a result of a partial summary judgment motion, not a trial. *Id.* at 809–810, 556 N.Y.S.2d 183. Moreover, given the relatively short gap in time between the two proceedings, critical evidence (be it testimonial or documentary) still remained available. *Id.* For these reasons Justice Baer left it for another occasion whether to "carve out an exception to the rule that the vacatur of a judgment is not a meaningless act for the purposes of issue preclusion." *Id.* at 809, 556 N.Y.S.2d 183.

Despite defendants' protestations to the contrary, Justice Baer did not find that under no set of circumstances could the general rule against affording preclusive effect to vacated judgments give way.

Justice Baer expressly left open the possibility that an exception may exist where certain circumstances were present. *Id.* at 810, 556 N.Y.S.2d 183. The *Mercantile* court's decision not to categorically foreclose application of collateral estoppel to vacated judgments is consistent with the recognition in New York law that application of collateral estoppel is not a rigid and inflexible concept, but one which produces varied results in different cases based on how particular circumstances in those cases tilt the equities and/or hardships. *See Juan C. v. Cortines,* 89 N.Y.2d 659, 667, 657 N.Y.S.2d 581, 679 N.E.2d 1061 (1997) (describing collateral estoppel as a "equitable doctrine" that is "grounded on concepts of fairness and should not be rigidly or mechanically applied"). Such recognition is reflected by a long line of New York cases citing approvingly to section 28 of the Restatement (Second) of Judgments which allows courts to avoid applying the collateral estoppel doctrine when it would otherwise be warranted if special circumstances exist.[5] This is the very section that the Ninth Circuit in *Ringsby* described as epitomizing the principal under collateral estoppel that the "answer may be different in different cases as equities and hardships vary the balance between the competing values of right to relitigate and finality of judgment." 686 F.2d at 722. Thus, after *Mercantile,* there remains the possibility that a vacated judgment could be afforded preclusive effect if exceptional circumstances are present to warrant it. *See Mercantile,* 147 Misc.2d at 810, 556 N.Y.S.2d 183 (observing that whether such an exception should apply in a future case "may well require consideration of factors that the parties have not

---

5. *See Hodes v. Axelrod,* 70 N.Y.2d 364, 520 N.Y.S.2d 933, 515 N.E.2d 612 (1987); *Juan C. v. Cortines,* 89 N.Y.2d 659, 657 N.Y.S.2d 581, 679 N.E.2d 1061 (1997); *Augustine v. Sugrue,* 8 A.D.3d 517, 779 N.Y.S.2d 515 (2004); *People v. Roselle,* 193 A.D.2d 56, 602 N.Y.S.2d 50 (1993); *Goldstein v. Consolidated Edison Co. of New York, Inc.,* 93 A.D.2d 589, 462 N.Y.S.2d 646 (1983).

briefed or discussed and that might necessitate reflection not available to me as this trial approaches" (citing *Ringsby* )).

The exceptional circumstances noted in *Mercantile* are present here. *Mercantile* approvingly noted the district court decisions in *Aetna* and *Angstrohm* as worthy exemplars of when application of such an exception is warranted. In both cases, a judgment was entered after a trial, the judgment was later vacated by the court after the parties reached a settlement, and, at least in *Aetna,* a significant period of time (more than eight years) then passed before a separate proceeding was instituted where the preclusive effect of the earlier vacated judgment became an issue. Here, the vacated referee's findings were made following a trial that was conducted more than *sixty* years ago; all of the material witnesses to the transactions in question are now deceased; and some of the documents from that time are now lost. These facts fundamentally alter the balance of interests observed in *Mercantile.*

Failure to give preclusive effect to the referee's vacated findings here would seriously compromise the conservation and efficient use of judicial resources. The referee's findings were tendered after that court's expenditure of numerous resources in conducting a trial, listening to testimony, parsing over the record, and then rendering a judgment. All of those hard-pressed resources will simply be squandered were the Court not to afford those findings preclusive effect. This by itself, however, would probably not be enough to give preclusive effect to the referee's findings. *See Ruben,* 592 N.Y.S.2d at 171 (refusing to afford collateral estoppel effect to a vacated judgment that had been tendered following a trial and a verdict returned by a jury). But there is more: Absent reliance on the referee's vacated findings, the lengthy passage of time since the trial and decision would seriously

threaten the reliability of any judgment handed down in the present case. To believe that the factual issues actually litigated before the referee in the 1947 Westchester action could be relitigated in the present proceeding without a significant degradation of the reliability of the conclusions reached in this proceeding would give this Court and the parties' counsel too much credit. Here, all the Court has is some, but not all, the documents from the relevant period; additionally, there are no witnesses who could testify to give life and context to those documents still in existence. Some of the copyright questions under examination in this proceeding will require much more understanding than a partial paper trial could provide. Understanding the meaning of a document is oftentimes the product of much more than simply looking at its words; live witness testimony provides color, understanding, and context of the document's existence and meaning. The only court with the opportunity to assess the credibility of such live testimony in connection with this legal dispute was presided over by the referee in the Westchester action. To refuse to afford the findings the referee made after consulting *all* the documents, and hearing all the live testimony on the topic would to be to deprive the record of the permutations, nuances, and subtleties those witnesses' recollections placed on the meaning of those documents now brought before this Court to examine. If the eight-year gap in *Aetna* was sufficient to warrant a finding that exceptional circumstances existed to give preclusive effect to a vacated judgment due to the "dimmed" memories of those witnesses who could still be found and the loss of documents that occurred in the interim, 440 F.Supp. at 405, a sixty-year gap certainly suffices.

All that defendants can point to in rebuttal is that the parties bargained for wiping the evidentiary slate clear, replac-

ing it with their settlement agreement and the final consent judgment. Admittedly, this fact does weigh against giving preclusive effect to the referee's findings, but the significance of the parties' expectations is diminished by the particular concerns implicated in this case. To fail to give preclusive effect to the referee's findings in a case with such a lengthy gap between proceedings may very well make it extremely difficult, if not impossible, to create any reliable findings in the present litigation over plaintiffs' attempt to terminate the grants conferred to defendants shortly after those referee's findings were made. *See Aetna,* 440 F.Supp. at 405. Focusing solely on the parties' expressed intent as the lodestar for deciding whether collateral estoppel applies or not in this case would be to place the thumb too heavily on the side of the scale against preclusion without sufficiently taking account of the serious concerns that have arisen weighing in favor of preclusion due to the passage of time since the Westchester action took place.

This leads to another significant issue: The *scope* of the parties' private interest. Although it is undoubtedly true that the parties sought to avoid giving the referee's vacated findings preclusive effect, it must be remembered the context in which that private interest was expressed. The parties' sought to bar the further relitigation of claims relating to the scope of the grant itself to Superman's and Superboy's copy-right (the ownership question); the stipulation and consent judgment served to end further debate on that point.[6] *See Siegel,* 508 F.2d at 913 (noting that effect of parties' stipulation and final consent judgment was to "finally determine[ ] that Detective ... owned all rights to Superman without limitation"). Neither side, however, had any inkling of the existence of the current copyright claim at issue in this case—namely, the 1976 Act's creation of the right to *terminate* grants to copyrights. Reference to the private parties' interest as a means to defeat giving preclusive effect to the referee's vacated findings in this case, therefore, would be to stretch the parties' intentions to cover the litigation of issues in a cause of action (the termination of ownership) they themselves had no idea would exist or that they even sought to safeguard against. *Cf. Marvel,* 310 F.3d at 288 (refusing to afford *res judicata* to parties' earlier pre–1976 Act settlement agreement concerning nature of grant of copyright in subsequent suit seeking to litigate termination of that grant).

Undoubtedly some of the factual questions considered in the present effort to terminate the grant of rights to the Superboy copyright will touch upon the same facts as litigated in the state action over ownership to that same copyright. Nonetheless, the point remains that those issues are brought in the context of a legal right that was not conferred until decades later

---

**6.** The parties' consent judgment would not have estopped further litigation of the issues related to the ownership question, such as work for hire status, *etc.,* because neither the consent judgment nor the stipulation contain any findings with respect to those issues; instead, the consent judgment simply declares that Detective Comics was the sole and exclusive owner of Superman and Superboy, and leaves it at that. *See Marvel,* 310 F.3d at 289 ("where a stipulation of settlement is 'unaccompanied by findings,' it does 'not bind the parties on any issue ... which might arise in connection with another cause of action.' Here, although the Settlement Agreement contained detailed findings on the authorship issue, neither of the stipulations filed in the Prior Actions contain any specific findings as to whether Simon authored the Works independently or whether the Captain America character was created as a work for hire. Nor do the stipulations reference the Settlement Agreement in any way. Therefore, the stipulations do not collaterally estop Simon from litigating the *issue* of authorship underlying his termination claim in this action").

in the 1976 Act. Without giving preclusive effect to the referee's vacated findings in this case, the right Congress sought to give to artists and their heirs would be seriously (if not, fatally) undermined simply through the passage of time, leaving in its wake nothing but a partial documentary record, uncolored or given context by live testimony, concerning factual questions critical in exercising that right to terminate prior grants. Again, there are no detailed findings contained in the parties' stipulation or final consent judgment to which the Court could otherwise defer, leaving the evidentiary slate clean in this case save for the referee's vacated findings.

Indeed, the concern with the passage of time is invariably present with the exercise of the termination rights conferred by the 1976 Act; through passage of section 304 Congress effectively resurrected ownership to copyrights that had otherwise long ago been thought to belong to the publisher since the Supreme Court's 1943 decision in *Fred Fisher Music.* Here, concerns with the effectiveness of the 1976 Act termination remedy are alleviated to some extent with the presence of the referee's vacated findings. Those findings essentially encapsulate the perception and recollection of the key participants to many of the factual questions now at issue in this case. This point is important to keep in mind as it further diminishes the weight of the interest against giving preclusive effect to the referee's findings.

When the private interest of the parties from the Westchester action is compared to the substantial concerns weighing in favor of continuing to give preclusive effect to the referee's vacated findings— preventing the loss of the considerable judicial resources expended in the Westchester action that will otherwise not be effectively replicated in the present proceeding with as much assurance as the

prior proceeding due to the loss of critical witnesses and documents over the ensuing sixty year period—it is clear to this Court that exceptional circumstances exist to give continuing preclusive effect to the referee's findings despite their later vacatur.

## III. INTERSECTION OF COLLATERAL ESTOPPEL DOCTRINE WITH CONCEPTS UNIQUE TO COPYRIGHT LAW

Although the vacatur of the referee's findings does not, *ipso facto,* defeat treating those findings as an estoppel, there remains a complicating wrinkle that affects the scope and contours of the estoppel effect of those findings—the longstanding Congressional grant of exclusive jurisdiction over copyright to the federal courts. *See* 28 U.S.C. § 1338(a) ("The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to ... copyrights.... Such jurisdiction shall be exclusive of the courts of the states in ... copyright cases"); *see also* 28 U.S.C. §§ 41(7), 371(5) (repealed). This legal reality is important to this case as a number of the issues that must be addressed in determining the validity of the Superboy termination notice are unique to federal copyright—specifically, whether the copyrightable material, if any, contained in Siegel's Superboy submissions was ever "published," done as a "work for hire," done as a "joint work" with Shuster, or as "derivative work" of Superman.

■ To begin, there is little question that state law matters are inextricably intertwined with many of the issues that arise in copyright disputes, whether it be matters involving the interpretation of contracts or concerns with the legal effects flowing from the formation of various business associations. It is well-established in

the case law that state courts can determine matters of state law, the subject of which is a copyright, and federal courts must afford preclusive effect to those findings, even if giving such preclusive effect impacts, in whole or in part, consideration of matters peculiar to copyright law. *See Vanderveer v. Erie Malleable Iron Co.*, 238 F.2d 510, 513 (3rd Cir.1956) ("Although the bringing of actions arising under the patent laws is admittedly restricted to the federal courts, it has long been established that actions brought to enforce contracts of which a patent is the subject [may] ... be brought in the state courts. The Supreme Court has held that a state court is empowered to determine questions, as distinguished from cases, arising under the patent laws, ... and the court has given no indication that the conclusive effect between the parties of the determination of these questions is to be limited to the state courts"); *T.B. Harms Co. v. Eliscu*, 339 F.2d 823, 826 (2nd Cir.1964) ("copyright has not been thought to infuse with any national interest a dispute as to ownership ... turning on the facts or on ordinary principles of contract law"); *Knickerbocker Toy Co. v. Faultless Starch Co.*, 59 C.C.P.A. 1300, 467 F.2d 501, 509 (1972) ("Although 28 U.S.C. § 1338(a) provides that the federal district courts' original jurisdiction over copyright actions 'shall be exclusive of the courts of the states,' the state courts clearly may pass on the validity of a copyright ... in the course of deciding a case over which they do have jurisdiction"); *Murphy v. Gallagher*, 761 F.2d 878, 886 (2nd Cir.1985) (giving preclusive effect to state court resolution of the dissolution of a corporation even though such resolution conclusively determined later federal securities fraud claim); *Jasper v. Bovina Music, Inc.*, 314 F.3d 42, 46 (2nd

Cir.2002) ("if the case concerns a dispute as to ownership of a copyright, and the issue of ownership turns on the interpretation of a contract, the case presents only a state law issue"); *see also* Note, *The Collateral Estoppel Effect of Prior State Court Findings in Cases Within Exclusive Federal Jurisdiction*, 91 HARV. L.REV. 1281, 1285 (1978) (noting that exclusiveness of federal jurisdiction does not upset "the interests of the state courts in the integrity of their findings on matters of state law within the normal sphere of their competence").

■ That said, a state court's direct findings on matters peculiar to copyright law itself would *not* be entitled to preclusive effect, either because such findings are not necessary to the resolution of the case before it or, if necessary, then the state court's finding exceeds its jurisdiction.[7] *See* Note, 91 HARV. L.REV. at 1287 ("[F]ederal courts should give preclusive effect to state determinations of state questions pleaded in the complaint, even if such issues arise in a subsequent action within exclusive federal jurisdiction. No preclusive effect, however, should be given to state court determinations of federal [questions] arising under laws whose enforcement is within the exclusive jurisdiction of the federal courts"). Nor should a state court's findings on matters of state law be neatly and uncritically translated *verbatim* as a finding on a legal concept unique to copyright law simply because it used the same phrase as the concept in question. *See Music Sales Corp. v. Morris*, 73 F.Supp.2d 364, 377–78 (S.D.N.Y. 1999) ("Finally, the issues raised in this dispute and in the 1989 [state court l]itigation are different and are governed by

7. This principle would not, however, hold true of state court decisions concerning unpublished material made during the time the 1909 Act was effective. Such "copyright" decisions were expressly left by the 1909 Act for state courts to determine under the common law. *See* 17 U.S.C. § 2 (repealed).

different principles of law. This difference violates the estoppel requirement that the issues be identical in *fact and law*. In the first action, Morris and the Strayhorn Estate, then plaintiffs, sought, inter alia, the rescission of the 1962 Agreement and 1965 Amendment based upon Tempo's nonperformance. They did not raise the terminability or invalidity of those contracts under copyright law, the issues raised in this dispute. These different issues are governed by entirely different law. Issues are not identical where the statutes, legal principles, or legal standards governing them differ—even when the different issues rest on the same facts" (emphasis in original)). However, even in such situations where a state court's proper and legitimate findings necessarily impact a matter of peculiar copyright law, those factual findings by the state court, save for the ultimate legal conclusion on a matter exclusively of copyright law, are entitled to preclusive effect. *See* Note, 91 HARV. L.REV. at 1289 ("the federal court can give preclusive effect only to those specific findings which can be deduced from the state mixed finding of fact and law").

The present case and that decided in the Westchester action concern discrete and separate legal claims: The latter involved state law claims for misappropriation of property while the former involves federal copyright claims. To be sure, these claims have significant factual overlap, but the resolution of the legal claims in the Westchester action are not necessarily determinative of the purely copyright legal claims in the present action.

The best illustration of this point is the Supreme Court's decision in *Becher v. Contoure Laboratories, Inc.*, 279 U.S. 388, 49 S.Ct. 356, 73 L.Ed. 752 (1929). In that case, Becher, a machinist, was employed to construct Oppenheimer's invention as well as the improvements he made to his invention from time to time. As part of his employment, Becher agreed to keep secret and confidential the information he obtained from his employment and to not use it for his own benefit or for that of anyone else. Contrary to his employment agreements, Becher obtained a patent for himself based on information he learned from making instruments for Oppenheimer. Oppenheimer obtained a judgment in a state court suit against Becher for breaches of contract and fiduciary duty, that determined that Becher's attainment of the patent was without Oppenheimer's knowledge and was done "in violation of his agreement" with Oppenheimer, and required Becher to, among other things, deliver "an assignment of the . . . patent and give up instruments similar to the invention." Instead of abiding by the state court judgment, Becher brought a federal suit for patent infringement, arguing that the earlier state court judgment should be disregarded because, if it was sustained, it would serve to establish the invalidity of his patent, and questions concerning the validity of patents are questions for the federal courts alone.

Justice Holmes, writing for a unanimous court, affirmed the lower court's ruling that the state court determinations precluded relitigation of those factual issues in the patent case in federal court. The opinion began by noting that the validation of Oppenheimer's claims in state court did not arise under or require the consultation of the patent laws, but were purely state law determinations independent of patent. *Id.* at 391, 49 S.Ct. 356 ("Oppenheimer's claim was an undisclosed invention which did not need a patent to protect it from disclosure by breach of trust"). Turning to the argument that, in establishing Oppenheimer's state law claim that a breach of fiduciary duty and a breach of contract occurred, the state judgment necessarily invalidated Becher's patent, Justice Holmes reasoned that the grant of exclusive jurisdiction "does not give sacrosancti-

ty" to questions of fact which might also be conclusive of the federal claim. *Id.* Again, the state court proceedings addressed only state law matters "independent of the patent law." *Id.* Though giving preclusive effect to the state court's factual findings led to the legal conclusion of an invalid patent, "that is not the effect of judgment. Establishing a fact and giving a specific effect to it by judgment are quite distinct." *Id.* "A fact is not prevented from being proved in any case in which it is material, by the suggestion that if it is true an important patent is void...." *Id.* at 391–92, 49 S.Ct. 356.

██ The principle to be culled from *Becher* is that federal courts are to give preclusive effect to earlier state determinations of state questions pleaded in the complaint, even if such state law issues arise in a subsequent action within the federal court's exclusive jurisdiction, like copyright or patent. Such estoppel, however, only operates as to the purely state law claims (and attendant facts) decided by the state court. A federal court cannot simply transplant a state court's finding as including the legal conclusions of the purely and exclusively federal issues before it; although in some instances, those state findings may prove "material" to the resolution of the exclusively federal law claim, such resolution of that federal question must involve the application of those state findings to the governing federal law on the topic in question before making the legal conclusion concerning the exclusively federal issues.

The boundaries established by the Supreme Court in *Becher* were highlighted in the Second Circuit's influential decision in *Lyons v. Westinghouse Electric Corp.*, 222 F.2d 184 (2nd Cir.1955). There Westinghouse brought suit in state court arguing that Lyons had breached a contract "made with it as its agents for the sale of electric lamps." *Id.* at 185. Lyons interposed as a

defense that the contract was unenforceable as it was the product of a conspiracy between Westinghouse and General Electric "to restrain competition in the marketing of such lamps" by requiring agents to "observe uniform price schedules" and prohibiting them "from competing among each other," all in violation of the federal anti-trust laws. *Id.* at 186. After a trial, the state court found the federal defense without merit and awarded judgment to Westinghouse. While the matter was on appeal, Lyons filed an action in federal district court alleging the same conspiracy to violate the federal anti-trust laws. The district court stayed the federal proceedings pending resolution of the state appeal. The Second Circuit granted Lyons a writ of mandamus and ordered the district court to vacate the stay.

In granting mandamus relief, Judge Learned Hand, writing for the majority, made clear that, absent such relief, the state proceedings would be allowed to culminate in final settlement of the matter, leaving Westinghouse "in a position to plead the [state court] judgment as an estoppel, and, if it is successful, that will dispose of the action at bar without a trial." *Id.* at 186. Judge Hand explained that such estoppel will "in substance" end the federal proceedings as it "will conclude any future consideration of the existence of the conspiracy" upon which "all else depends" for Lyons' federal suit. *Id.* Such a result would thus threaten the Congressional grant to federal courts of exclusivity over jurisdiction of the federal anti-trust laws. Acknowledging that the state court "had undoubted jurisdiction ... to decide the merits of" Lyons' defense, Judge Hand nonetheless reasoned that the existence of exclusive federal jurisdiction over federal anti-trust claims required a more limited preclusive effect be given to state court judgments when later litigating such federal claims in federal court. Towards that end, Judge Hand analyzed *Becher*, and

relying on section 71 of the Restatement of Judgments,[8] distilled the following principal from the Supreme Court's decision: "[There is a] distinction ... between the finding of one of the constituent facts that together make up a claim and the entire congeries of such facts, taken as a unit; an estoppel is good as to the first but not as to the second." *Id.* at 188; *see also Red Fox v. Red Fox,* 564 F.2d 361, 365 n. 3 (9th Cir.1977) (citing with approval quoted proposition from *Lyons* ). "The distinction between 'constituent' facts and 'congeries' of facts is generally equated with the distinction between findings of fact and the application of law to fact." Note, 91 HARV. L.REV. at 1284.

This principal has found expression in modern cases' reliance on state laws that deny giving preclusive effect to an earlier state court judgment where such estoppel would be a bar to litigating a claim within the exclusive jurisdiction of the federal courts. *See Marrese,* 470 U.S. at 381–82, 105 S.Ct. 1327 ("To be sure, a state court will not have occasion to address the specific question whether a state judgment has issue or claim preclusive effect in a later action that can be brought only in a federal court. Nevertheless, a federal court may rely in the first instance on state preclusion principles to determine the extent to which an earlier state judgment bars subsequent litigation .... a federal court can apply state rules of issue preclusion to determine if a matter actually litigated in state court may be relitigated in a subsequent federal proceeding"). Thus, courts have found that an earlier state court judgment did not preclude litigation of issues within the exclusive jurisdiction of federal courts because (citing to state law preclusion principles) of the lack of identity between the state law claims and the federal ones at issue. *See RX Data Corp. v. Department of Social Servs.,* 684 F.2d 192, 197–98 (2nd Cir.1982) (refusing to afford preclusive effect from prior state court action because there was a lack of identity of issues between the state and federal suits).

Collateral estoppel has also been found *not* to apply because (under state law preclusion principles) the particular federal issue could not be addressed by the state court (or, if it was, the state court's judgment was a nullity) as it was beyond its jurisdiction. *Id.* at 198 (refusing to afford preclusive effect to earlier New York Court of Claims decision because a claim for copyright infringement was beyond its jurisdiction to decide). Indeed, the Supreme Court itself has noted that fresh consideration of most issues peculiar to a matter of exclusive federal jurisdiction would not be barred by earlier state court rulings that purported to address those same issues, because the matter would lie beyond the state court's jurisdiction to decide and hence not be entitled to preclusive effect under state law. *See Marrese,* 470 U.S. at 382, 105 S.Ct. 1327 ("we note that claim preclusion generally does not apply where 'the plaintiff was unable to rely on a certain theory of the case or to seek a certain remedy because of the limitations on the subject matter jurisdiction of the courts.' If state preclusion law includes this requirement of prior jurisdictional competency, which is generally true, a state judgment will *not* have claim preclusive effect on a cause of action within the exclusive jurisdiction of the federal courts").[9]

---

8. That section provided that "[w]here a court has incidentally determined a matter which it would have had no jurisdiction to determine in an action brought directly to determine it, the judgment is not conclusive in a subsequent action brought to determine the matter directly."

9. Again, the matter would be much more difficult if the Westchester action involved a

These same limits to collateral estoppel and related doctrines are present in New York law. *See Gramatan Home Investors Corp. v. Lopez,* 46 N.Y.2d 481, 485, 414 N.Y.S.2d 308, 386 N.E.2d 1328 (1979) (noting that collateral estoppel analysis of whether state court judgment is entitled to preclusive effect is determined, in part, by whether there exists "a judgment on the merits by a court of competent jurisdiction"); *Mural Arts v. Sonsandi,* 82 N.Y.S.2d 153, 154–55 (N.Y.Sup.1948) ("no judgment may be held to be res judicata as to an issue over which there was no jurisdiction in the Court rendering the judgment"); *see also Accolla v. Ladestri,* 1989 WL 129484 *2 (S.D.N.Y. Oct. 26, 1989) ("Under New York law, it is clear that 'a claim is not barred by res judicata if the court in which the first action was brought lacked subject matter jurisdiction to adjudicate the claim' ").

In the final analysis, then, when confronted with the effect of a prior state court judgment on the present litigation of an issue that is uniquely within the exclusive jurisdiction of the federal courts, federal courts must focus on what the particular matters at issue in the state suit were and analyze the potential preclusive effect of that state court's judgment through that lens. When viewed in this context, many of the matters resolved by the state court will not address directly the unique federal issues, leaving it to the parties in the federal suit to present evidence and for the federal court to resolve the federal issue. Although many of the state court's findings may properly bear on the analysis of the federal issue, in the end, the federal court's conclusion must be the product of the application of federal law to those state

court findings and any additional evidence properly considered by the federal court.

Here, many of the conclusions contained in the Court's March 23, 2006, Order were not the result of such a careful consideration and comparison of what was (and what was not) decided in the state court to resolve the state law claims there and of the federal questions at issue in the present case. Instead, the conclusions were the product of the Court simply treating (and then transcribing) the referee's findings en masse (especially those that contained the same phrases as those at issue in the present copyright matter), as if the Westchester action was a copyright case that conclusively settled issues unique to copyright. The Order's analysis failed to apply the governing body of copyright law to the referee's findings as is required under *Lyons* and the collateral estoppel doctrine under New York law. Although the referee's findings are relevant to some of the copyright issues in this case (most notably, whether Superboy was a work for hire), they are not wholly dispositive.

The March 26, 2006, Order missteps near its beginning when it characterizes defendants' arguments as an "attempt to relitigate issues *determined* in the 1947 state court case," (Order at 6) suggesting that the copyright issues at stake in the present litigation were litigated and resolved in the Westchester action. This perspective is reflected in the Order's treatment of the previously mentioned copyright issues. For instance, the Order observes that the referee "specifically determined that Detective Comics published the Superboy comic strip based upon the idea, plan, and conception of Siegel, in a

state law that was a mirror image of federal copyright law or involved ownership to unpublished material as such matters were generally left for state courts to resolve under the 1909 Act. Here, however, the parties suit concerned state common law tort claims involving the alleged "wrongful publication" of Siegel's idea clearly implicating the governing body of federal copyright law.

magazine entitled *More Fun Comics.*" (Order at 8). Notably absent from the Court's analysis was any indication whether such printing of the idea or concept of Superboy envisioned by Siegel necessarily meant that Siegel's submissions themselves (as opposed to the general idea embodied within) was published as a matter of federal copyright law, or whether such printing of general ideas contained in an otherwise detailed submission is sufficient to count as a publication. Instead, the finding was accepted as if the referee engaged in this detailed analysis in making that finding because the finding contained the term "published." If that was what the referee did, he exceeded his jurisdiction to do so.

When speaking of the joint work issue, the Order simply notes that the referee found that Siegel was the sole originator and owner of Superboy, and concludes that this finding means Superboy could not be a joint work. (Order at 14). Again, the Order does not apply governing federal copyright law to the referee's findings so as to independently reach a conclusion whether Superboy was a joint work nor does it examine the nature of the Westchester action to determine what was being decided when the referee made that finding; instead, recitation of the referee's finding alone is used to directly perform that function.

On whether Superboy is a derivative work of Superman, the Order simply, without any analysis, states that litigation of such a question would be inconsistent with the referee's findings that Siegel owned Superboy and the payment for the subsequent transfer of the same per the parties' settlement agreement. (Order at 11–12).

Given all this, the Court finds defendants' motion for reconsideration of the Order well taken. Accordingly, the Court turns its attention to determining whether and to what extent the referee's vacated findings compel any conclusions as to the peculiar federal copyright issues before it; specifically, whether those findings impact the issues of whether Siegel's Superboy submissions were "works for hire," whether they were the product of a "joint authorship," whether they were subsequently "published," and whether they were a "derivative work."

**A. Work Made For Hire**

Under the 1976 Act, an author's (or his or her heirs') ability to terminate a prior grant in the copyright to his or her creation does not apply to a "work made for hire" because the copyright in such a creation never belonged to the artist in the first instance to grant. *See* 17 U.S.C. § 304(c). This proscription naturally raises the important question of whether Siegel's Superboy submissions were a "work made for hire." If so, then Siegel's heirs cannot seek to terminate his earlier grant of the Superboy copyright to defendants' predecessors in interest, such a grant being merely a superfluous act that did not alter the pre-existing ownership rights to that copyright. *See Playboy Enterprises, Inc. v. Dumas,* 53 F.3d 549, 554 (2nd Cir. 1995) ("Once it is established that a work is made for hire, the hiring party is presumed to be the author of the work").

Resolution of this question, as with all the copyright questions presented in this case, is controlled by the governing body of law in existence at the time Siegel submitted his Superboy material to Detective Comics, that is, the 1909 Act and the precedent developed thereunder. *See Self–Realization Fellowship v. Ananda Church,* 206 F.3d 1322, 1325 (9th Cir.2000) ("Because all of the copied works were created before 1978, the Copyright Act of 1909 governs the validity of the initial copyrights"); *Twentieth Century Fox Film Corp. v. Entertainment Distributing,* 429

F.3d 869, 876 (9th Cir.2005) ("We first consider Twentieth Century Fox Parties' infringement claims under the now repealed Copyright Act of 1909 because *Crusade in Europe* was published before the ... effective date of the 1976 Copyright Act").

The 1909 Act provided that, "[i]n the interpretation and construction of this title[,] ... the word 'author' shall include an employer in the case of works made for hire." 17 U.S.C. § 26 (repealed). "Thus, with respect to works for hire, the employer is legally regarded as the 'author,' as distinguished from the creator of the work, whom Learned Hand referred to as 'the "author" in the colloquial sense.'" *Martha Graham School and Dance Foundation, Inc. v. Martha Graham Center of Contemporary Dance, Inc.,* 380 F.3d 624, 634 (2nd Cir.2004). Nowhere did the 1909 Act define what was meant by "work made for hire" or "employer"; only the consequences flowing from such a designation were spelled out. The task of giving meaning to these terms fell to the courts. The Ninth Circuit eventually formulated the "instance and expense test" to determine whether a work is one made for hire under the 1909 Act. As explained by the Ninth Circuit:

> [W]hen one person engages another, whether as employee or as an independent contractor, to produce a work of an artistic nature, that in the absence of an express contractual reservation of the copyright in the artist, the presumption arises that the mutual intent of the parties is that the title to the copyright shall be in the person at whose instance and expense the work is done.

*Lin–Brook Builders Hardware v. Gertler,* 352 F.2d 298, 300 (9th Cir.1965). The test sought to match the concept of a work made for hire with the purpose of the Copyright Act. As one court explained: "[T]he law directs its incentives towards the person who initiates, funds and guides the creative activity, namely, the employer, but for whose patronage the creative work would never have been made. Copyright law 'is intended to motivate the creative activity of authors ... by the provision of a special reward.'" *Estate of Hogarth v. Edgar Rice Burroughs, Inc.,* 2002 WL 398696, at *19 (S.D.N.Y. March 15, 2002) (quoting *Sony Corp. v. Universal City Studios, Inc.,* 464 U.S. 417, 429, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984)). Toward that end, the instance and expense test requires the evaluation of three factors: (1) At whose instance was the work prepared; (2) whether the hiring party had the power to accept, reject, modify, or otherwise control the work; and (3) at whose expense was the work created. *See Twentieth Century,* 429 F.3d at 879, 881. Such an inquiry is a mixed question of law and fact. *See id.* at 877.

Because such an inquiry requires the application of facts to the law, the parties spar over whether the referee's vacated findings did (or could) conclusively determine whether Siegel's Superboy submissions were a work made for hire.

Plaintiffs begin by arguing that the referee's finding that Siegel was the "originator and sole owner" of Superboy conclusively establishes that his submissions were not a work made for hire and that defendants are estopped from seeking to relitigate that finding. The Court disagrees. Nowhere in his findings did the referee once speak of work for hire (and plaintiffs, to their credit, acknowledge that the referee "did not mention the phrase"). Certainly, the referee made findings dealing with the parties' business and contractual relationship concerning Siegel's Superboy submission, factual issues that touch upon the work made for hire question, but that was as far as the referee went. Whether those findings, when ap-

plied to the governing body of law under the 1909 Act, establish that those submissions were made as a work for hire is a question left for this Court to answer in the first instance.

Perhaps the best and most important example of this point is found in the Second Circuit's decision in *Siegel.* One of the issues pressed by the parties in that case was whether the referee's findings conclusively resolved the issue of whether Superman was a work made for hire. The district court found that it did because the parties' business dealings demonstrated the "existence of an arrangement going beyond an assignor-assignee relationship" to one more akin to a "classic employment relationship." 364 F.Supp. at 1036. In reaching this conclusion, the district court pointed to the referee's findings that Siegel and Shuster were under a contract of employment with Detective Comics at the time Superman was published; that Detective Comics's required Siegel and Shuster to return their original 1933 Superman material for revision and expansion before it could be published in *Action Comics;* and that the resubmitted material constituted the formula for the continuing Superman series. *See Id.* at 1036–37. The district court further concluded that Siegel and Shuster were barred by *res judicata* from seeking to relitigate the factual basis of the work made for hire question. *Id.* at 1037.

For its part, the Second Circuit disagreed with the district court's invocation of *res judicata.* The court of appeals noted that, "[w]hile it is evident that the state court concluded as a matter of law that the plaintiffs conveyed all their rights in Superman to the defendants," there was "no conclusion of law in the state court that the comic strip was a work for hire so as to create the presumption that the employer was the author. That issue was not litigated at all in the state court." 508 F.2d at

914. That said, the Second Circuit did note that several of the referee's findings were *relevant* to the question of whether Superman was a work for hire, but, unlike the district court, concluded that those findings pointed against a determination that Superman was a work made for hire as a matter of federal copyright law. *Id.* The Second Circuit seized on the referee's findings concerning the nature of the 1933 Superman material as indicating that "Superman and his miraculous powers were completely developed long before the employment relationship was instituted," and further diminished the significance of the revisions called for by Detective Comics as "simply to accommodate Superman to a magazine format." *Id.* Given these facts, the Second Circuit concluded that Superman did not meet the "instance and expense" test under the 1909 Act. *Id.* In essence, by looking to and applying those specific *factual* findings by the referee to the relevant body of copyright law on works made for hire, the Second Circuit concluded that the original renderings of Superman constituted the original works, later elaborations of which constituted, at most, derivative works. *Id.* at 914; *see also* 1 Nimmer § 5.03[B][1][b] at 5–31 n. 92.

Thus, to say that the referee's findings conclusively held one way or the other on the question is mistaken. Rather, resolution of the issue requires this Court to do exactly what the Second Circuit in its time did—apply the governing body of copyright law under the 1909 Act to those findings made by the referee that are relevant to the question, and render a legal judgment. Such an undertaking is not, as plaintiffs argue, an attempt to "re-litigate" the nature of the parties' relationship, but rather to litigate, for the first time, that which was not addressed in the Westchester action—given the parties' business relationship as determined by the referee,

1138

was the submission of Superboy to Detective Comics a work made for hire. It is to that question that the Court now turns, with initial reference to the instance and expense test set forth above.

The "expense" requirement is met where a "hiring party simply pays an [employee or] independent contractor a sum certain for his or her work." *Playboy Enterprises,* 53 F.3d at 555. Such regular, periodic payments of a sum certain bear the hallmark of the wages of an employee required to produce the work in question for his or her employer, and not that of a party who is free to engage those other than the commissioning party in marketing his or her work. *See Donaldson Publishing Co. v. Bregman, Vocco & Conn, Inc.,* 375 F.2d 639, 642–43 (2nd Cir.1967). "In contrast, where the creator of a work receives royalties as payment, that method of payment generally weighs against finding a work-for-hire relationship." *Playboy Enterprises,* 53 F.3d at 555; *see also Twentieth Century,* 429 F.3d at 881 (finding that "expense" requirement met when publisher agreed to pay the author "a lump sum for writing the book, instead of negotiating a royalty deal").

Here, it is true that none of the costs or expenses incurred in creating the Superboy material (the paper on which the dialogue and story elements was printed, the typewriter used to put into concrete form the author's concepts of the same, *etc.,*) was borne by Detective Comics. The material was created at Siegel and Shuster's artist studio in Cleveland, Ohio, using office supplies and other materials bought and paid for by Siegel for the studio. Nothing from Detective Comics' offices in New York City was utilized in the creation of the Superboy material. All that said, nothing in the referee's findings or in the materials submitted by the parties in this case would suggest that this was not also the case for the other comic strips (Super-

man included) that Siegel and Shuster penned for Detective Comics pursuant to the September, 1938, employment contract. In addition, courts employing the instance and expense test have discounted reliance on the circumstances and the cost borne for the production of the work. Such consideration relates to the question of whether "an artist worked as an independent contractor and not as a formal employee," a distinction that has "no bearing on whether the work was made at the hiring party's expense." *Playboy Enterprises,* 53 F.3d at 555.

Moreover, Siegel was also paid nothing by Detective Comics when he submitted his Superboy material to it, and it rejected the material for publication. Nor was Siegel paid when Detective Comics ultimately published the material (assuming that Siegel's Superboy submissions were "published" in the magazine, *see infra* III.C.) in *More Fun Comics,* no. 101 four years later. The lack of payment of any kind for the material itself would ordinarily negate a finding that the expense requirement was met. This lack of payment for the Superboy material itself is particularly glaring considering that the referee found that Detective Comics would periodically pay Siegel and/or Shuster at their regular per page rate for editions of the *Superman* comic strip (a work for which they were employed to provide) even when neither of them had contributed any of the continuity (Siegel) or illustrations (Shuster) for the strip. A reasonable inference to draw from this practice would be that Detective Comics paid artists at least something for work they were employed to produce even if the material submitted ultimately was not published; however, with Superboy, no payments were ever made, regular or otherwise, leading to the clear legal conclusion that Siegel was *not* employed by Detective Comics to create the Superboy comic strip.

Defendants seek to downplay the absence of payment by noting that Detective Comics ultimately did pay Siegel over $90,000 in settlement of the Westchester action. This fact, however, only bolsters the finding that the Superboy submissions were not made at the expense of Detective Comics; instead, this payment was made only after Detective Comics had been publishing Superboy for a number of years. If the material was part of a work made for hire arrangement, such payment would have occurred at a time more contemporaneous with its creation and submission, not years later and only then after the publisher had been sued by the author for the unauthorized publication of the same (and not for breach of an employment contract or agreement). There is simply no evidence indicating that the parties had a business understanding or contractual relationship allowing for lengthy gaps in time between the creation of a work and payment for the same.

In the end, the complete lack of any periodic payment of a sum certain for Siegel's Superboy material leads the Court to find that the expense requirement has not been met in this case.

The "instance" component of the test inquires into "whether 'the motivating factor in producing the work was the employer who induced the creation.'" *Twentieth Century*, 429 F.3d at 879. That the commissioning party be the motivating factor is not a "but for" test—that is, but for the artist's employment the work would not have been created—but instead is a more narrow inquiry focused on the nature and scope of the parties' business relationship. As one court explained:

No doubt Graham was a self-motivator, and perhaps she would have choreographed her dances without the salary of Artistic Director, without the Center's support and encouragement, and without the existence of the Center at all, but all that is beside the point.

.    .    .    .    .

. . . . There is no need for the employer to be the precipitating force behind each work created by a salaried employee, acting within the scope of her regular employment. Many talented people . . . are expected by their employers to produce the sort of work for which they were hired, without any need for the employer to suggest any particular project. 'Instance' is not a term of exclusion as applied to specific works created within the scope of regular employment. It may have more significance in determining whether an employee's work somewhat beyond such scope has been created at the employer's behest or to serve the employer's interests. . . .

*Martha Graham*, 380 F.3d at 640–41. Thus, "under the 1909 Act a person could be an employee yet create a work 'as a special job assignment, outside the line of the employee's regular duties.' In that event, the work is not a work for hire." *Id.* at 635 (citing *Shapiro Bernstein & Co. v. Jerry Vogel Music Co.*, 221 F.2d 569, 570 (2nd Cir.1955)). The critical factor is what, if any, employment relationship (be it as an employee-employer or an employer-independent contractor) existed between the parties beforehand, and whether the work in question fell within the scope of those job duties. Toward that end, the "instance" requirement is also "shaped in part by the degree to which the hiring party had the right to control or supervise the artist's work," a circumstance reflective of the work being created within the confines of an employment relationship. *Twentieth Century*, 429 F.3d at 879 (internal quotation marks and citations omitted). Although it is not critical that the commissioning party actually exercise its right of control and supervision in the creation of

the work in question, it is necessary that the party *have* the right to direct, control, or otherwise edit the artist's work. *See Martha Graham*, 380 F.3d at 635 ("The *right* to direct and supervise the manner in which the work is created need never be exercised" (emphasis in original)).

Plaintiffs rely heavily on the referee's finding that Siegel submitted Superboy pursuant to the right of first refusal provision in the parties' September, 1938, agreement, and therefore it was not material Siegel was otherwise obligated to provide to Detective Comics (unlike the comic strips for Superman, Slam Bradley, the Spy, *etc.*,) in the course of his regular employment with the publisher. Given that the publisher had yet to agree to publish the material when Siegel submitted Superboy to Detective Comics, plaintiffs argue that Detective Comics could not possibly be seen as owning the material at the inception, something which it claims is a predicate for a work for hire.

Deciding not to publish material and owning the material beforehand are not mutually exclusive propositions. A publisher could own the material from its inception, but decline to publish it. Publication (or lack thereof) is not dispositive; what is critical, however, is the referee's finding that the creation of Superboy fell outside the scope of Siegel's regular job duties. The parties' contract called for Siegel (and Shuster) to provide Detective Comics the continuity and illustrations for certain specified comic strips in exchange for remuneration at a specified sum certain; Superboy was not among the comics Siegel was required to perform work for per the parties contract. The referee found that "Superboy was a separate and distinct entity" apart from Superman for purposes of the scope of the parties' September, 1938, agreement. It was for this reason that the referee thereafter analyzed the claims relating to Superboy through the lens of the right of first refusal provi-

sion. Siegel's presentation of Superboy to Detective Comics (rather than some other comic publisher) therefore was the result of the provision in the parties' contract requiring Siegel and Shuster to "first give [Detective Comics] the right to first refusal" for "any other art work or continuity suitable for use as comics or comic strips." Siegel's creation of the Superboy submissions was thus *independent*—entirely separate and apart—of his regular job duties with Detective Comics.

This then leads to the question of whether Siegel necessarily made his Superboy submissions specifically for the publisher, Detective Comics.

Here, there is no evidence that Siegel attempted to pitch his Superboy submissions to any other comic book publisher after Detective Comics initially turned him down. In fact the precise opposite is true. A little more than a year later he re-pitched the idea to Detective Comics, but in a more fully developed format. When this, too, was turned down by Detective Comics, there is no indication that Siegel went elsewhere to pitch his idea. Instead, it appears (much like with his original 1933 Superman material) Siegel tabled the material and continued to work on other, existing projects. Shortly thereafter, Siegel joined the United States armed forces and fought in World War II. When he returned home from his service to the country, the opportunity to pitch the Superboy submissions to other comic publishers was gone; Detective Comics had already been publishing a Superboy comic for a period of time in Siegel's absence. Nothing in the parties' papers or in the referee's findings shed any light as to whether Siegel only envisioned Detective Comics as the publisher for his material, or if in fact other publishers were also considered by him. Instead, the Court is left simply with the nature and structure

of the parties' contractual relationship in formulating a decision as to whether Siegel's Superboy submissions were works made for hire.

Viewed from this perspective, the situation is akin to a specially-commissioned work, rather than one produced in the regular course of an employee's job duties. Nimmer has drawn the same parallels for situations not that different than the present one:

> [A] situation may arise where the employer finds the employee's work unsuitable. . . . It seems probable that such unused material belongs to the employer, *at least if the contract of employment contains language purportedly [conveying to the employer] 'all' material [created by the employee].* Even when there is an agreement between employer and employee that employer shall own certain material to be created by the employee, if in the creation of such material, the employee is to work as an independent contractor (even if for other duties he is an employee), then the employer must claim such ownership by virtue of an assignment, rather than by virtue of his status as an employer.

1 Nimmer § 5.03[B][1][b] at 5–37 (emphasis added). Here, nothing in the parties' contract purported to convey to Detective Comics ownership to *all* the material Siegel and Shuster ever created; rather, the contract conveyed only the material created with respect to certain specified comic strips of which Superboy was not one. With respect to works other than those enumerated comic strips, the most Detective Comics had was a one-time opportunity to lay claim to Siegel's Superboy material. *See Broadcasting Corp. v. Metromedia Inc.,* 74 N.Y.2d 54, 56, 544 N.Y.S.2d 316, 542 N.E.2d 629 (1989) ("a right of first refusal merely provides ... a chance to buy"). The right of first refusal (and especially one that is not exercised) is fundamentally incompatible with a finding that a work falling within its provisions is a work made for hire. *Cf.* 1 Nimmer § 5.03[B][2][d] at 5–56.8 ("[A] commission relationship may not exist, even if the work is prepared at the request of another, and even if such other person bears the costs of its creation, where the person requesting the work is expressly granted only a one-time use"). Such a contractual provision is predicated upon the assumption that the material being submitted for the exercise of the option to publish belongs to the artist at the outset. *See LIN v. Metromedia, Inc.,* 74 N.Y.2d 54, 56, 544 N.Y.S.2d 316, 542 N.E.2d 629 (1989) (noting that, under New York law, a "right of first refusal" requires the *"owner,"* when and if he decides to sell, to offer the property first to the party holding the preemptive right so that he may meet a third-party offer or buy the property at some other price" (emphasis added)). If this were not so, there would be no need for the publisher to have the first opportunity at publishing the material; rather, it would already belong to the publisher, regardless of whether it publishes the material or not. Because material that is a work made for hire belongs at the inception to the publisher, having that same material submitted to the publisher in the first instance under a right of first refusal strongly suggests that it did not belong to the publisher when it was created.

A case illuminating this point is *Playboy Enterprises, Inc. v. Dumas,* 960 F.Supp. 710 (S.D.N.Y.1997). Among the paintings at issue in that case were several that the artist had submitted to but were turned down by Playboy. Although it turned down publishing the paintings, Playboy nonetheless paid the artist a "turn-down" fee for the work. The parties squabbled

over the impact these turned-down paintings had on whether the paintings that were accepted for publication were works made for hire. Playboy argued that its payment for paintings that it did not publish bolstered the impression that creation of the paintings (whether they were used or not) was due to it "request[ing] a submission from [the artist] each month," and undermined any argument that payments to the artist for those paintings were only for a one-time use. *Id.* at 715. The court agreed with Playboy, finding that the payments for unused works "show[ed] that it at least implicitly requested [the artist] to submit at least one painting a month and that it therefore was the motivating factor in the creation of those paintings." *Id.* As the district court elaborated: "The fact that Playboy made payments for unused work undercuts [the argument] that [those payments] must have been for the right to one-time use of the disputed works because [it] is all that Playboy required. But if Playboy never published a work at all, there would have been no reason to pay anything for it absent a for-hire relationship, as it would have had no need for any rights in such a case." *Id.* at 716.

The converse would also be true. The failure to pay for unused work, notably those falling outside the artist's regular job duties, supports the conclusion that the parties understood that such works fell outside the confines of any for-hire relationship between them and were created at the artist's instance. While payment demonstrates an acknowledgment on the publisher's part that the work was being done for their benefit, the *absence* of such payment creates just the opposite impression. *Cf. id.* ("The logical conclusion, and the one to which this Court comes, is that Playboy paid Nagel for works it did not use because he created them at its instance").

Thus, it appears that, at least viewed through the prism of the parties' business and contractual relationship, Siegel's submission of Superboy to Detective Comics was not a work made for hire. Defendants' attempt to cloud the issue by focusing on the derivative or non-derivative status of the Superboy material itself, a separate question on which the Court at this point reserves its ruling (*see infra* III.D.). If any of Siegel's Superboy material is derivative of Superman, then, defendants argue, use of that material would require the consent of Detective Comics, as the owner to the Superman copyright, before it is published. It is this required prior consent for publication that defendants contend impacts the work made for hire question. Such control over the material, it is argued, translates into Detective Comics holding the right to direct and supervise Siegel's Superboy material, something which they contend is sufficient by itself to render the material a work made for hire. In this regard defendants cite to *Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc.*, 342 F.3d 149, 163 (2nd Cir.2003) and *Picture Music, Inc. v. Bourne, Inc.*, 457 F.2d 1213, 1216–17 (2nd Cir.1972).

Defendants argument sweeps too broadly. Were the Court to adopt defendants' approach, every derivative work would also be considered a work made for hire. The ramifications of such a holding would be contrary to the 1909 Act's statutory scheme concerning derivative works, and is also unsupported by the case law construing the Act.

As noted earlier, the copyright to a work made for hire is owned at its inception by the commissioning party. If a derivative work is always a work made for hire, then there would be nothing left for the creator of the additional copyrightable material contained in the derivative work to own; the artist would have no copyright to that

material, it instead being owned by the copyright holder to the pre-existing work. The 1909 Act, however, recognized that such additional material contained within a derivative work was itself "subject to copyright" protection. 17 U.S.C. § 7 (repealed). Indeed, the 1909 Act specifically noted that "publication of any such new works" would not undermine the validity of the copyright in the pre-existing work. *Id.* For this reason, cases decided under the 1909 Act recognized that "[t]he aspects of a derivative work added by the derivative author are that author's property, but the element drawn from the pre-existing work remains on grant from the owner of the pre-existing work." *Stewart v. Abend,* 495 U.S. 207, 223, 110 S.Ct. 1750, 109 L.Ed.2d 184 (1990). If, as defendants contend, derivative works are always the property of the copyright holder of the pre-existing work owing to their work for hire status, there would be no need for the 1909 Act's concern with whether publication of that derivative work implied that the derivative author had "an exclusive right to such use of the original works," or, on the other hand, that "consent" of the owner to the pre-existing work must be obtained before adaptations to that work are produced by the derivative author. 17 U.S.C. § 7 (repealed). Those concerns would be internally inconsistent as a matter of logic and common sense. The copyright holder to the "original works" would necessarily be the owner of the additional material contained in the derivative work; its prior consent would be unnecessary as it would own the material for which consent is sought, and any such waiver would be logically inconsistent as the material for which such waiver would be sought would also be owned by the same entity.

Nor does the case law under the 1909 Act support defendants' position. In all the cases cited by defendants, the copyright holder of the pre-existing work approached the artist and specifically re-quested for the artist to create a work derived from that pre-existing material and then paid the artist for the derivative work in question, facts notably absent here. *See Hogarth,* 342 F.3d at 151–52; *Picture Music,* 457 F.2d at 1217. It was these additional elements of requesting and paying for specific derivative works that served to demonstrate that the creation of the derivative work was at the instance of the commissioning party, not the simple fact that the work itself was derivative. Nimmer in his treatise similarly distinguishes the principal case cited by defendants on that very basis. *See* 3 Nimmer § 9.03[D] at 9–28.3 (*"Picture Music* is limited to the situation where the commissioning party *supplies* to the independent contractor an underlying work upon which the independent contractor [then] fashions a derivative work" (emphasis in original)).

Here, in contrast, Detective Comics never requested that Siegel create Superboy nor did it approach him to utilize the pre-existing material from Superman for some unspecified derivative work. Instead, the idea for creating Superboy occurred while Siegel was talking to a Mr. Nimis (whose relationship to the parties is not disclosed in the pleadings or the referee's findings) about what " 'top' [comic] strip to use on the Sunday [newspaper] page of Superman," and Siegel suggested using "a strip named Superboy" relaying "the adventures of Superman as a youth." (Defs' App. of Docs. in Supp. Mot. Recons., Ex. 4). Nowhere did Mr. Nimis (even assuming he is affiliated with defendants' predecessors in interest) approach, request, or suggest that Siegel use the pre-existing Superman copyright material as a launching point for creating the comic strip to be placed at the top of Superman's Sunday comic strip. That idea was Siegel's creation alone.

All that said, the Court agrees with defendants that, *if* Siegel's Superboy submis-

sions were a derivative work, such a designation would have vested Detective Comics with the right to control that material (Detective Comics' consent being necessary for the material's production). The Court finds that this right to control, however, is not sufficient to conclude that Siegel's Superboy submissions were a work made for hire. Those submissions were neither prepared at Detective Comics' instance nor at its expense, points the Court finds more weighty in resolving the work made for hire question in this case. Those points are predicated upon the particular circumstances of the parties' relationship and the creation of the works in question, something that is not as particularized with respect to a statutory right inherent in all derivative works regardless of the relationship of the parties.

Accordingly, the Court finds that Siegel's Superboy submissions were not works made for hire.

## B. *Joint Work*

Defendants next argue that Siegel's Superboy submissions were contributions to a joint work with Shuster. The effort to characterize the submissions as part of a joint work is understandable. Under the 1909 Act, each joint author of a copyrightable work is a co-owner of the same and possesses "an undivided ownership in the entire work, including all of the contributions contained therein." 1 Nimmer § 6.03, at 6–7; *see also Davis v. Blige,* 419 F.Supp.2d 493, 500 (S.D.N.Y.2005) ("a co-owner has a legal right to grant a license in a work without another co-owner's permission or to transfer his rights in the copyright freely. Absent an agreement to the contrary, one joint owner may always transfer his interest in the work to a third party"). Given that Shuster provided the illustrations to Superboy at the direction of and was paid for the same by Detective Comics, those illustrations are arguably provided as a work for hire for the publisher, thus giving ownership over the same to Detective Comics.[10] If Superboy is determined to be a joint work, Detective Comics would own half of the copyright either as the author of Shuster's alleged work for hire artwork or as a consequence of the reversion of Shuster's half to them given his or his heirs failure to timely exercise the right to termination, thereby allowing it to continue to exploit the copyright to Superboy subject only to having to provide an accounting to plaintiffs for any profits gained therefrom. *See* 1 Nimmer § 6.10; *see also Oddo v. Ries,* 743 F.2d 630, 632–33 (9th Cir.1984).

The 1976 Act, which codified the principles for joint authorship established in the case law under the 1909 Act, *see* 1 Nimmer § 6.01 at 6–3 n. 1, does not provide a definition for an "author" or "joint authors" in a copyright, but instead defines a "joint work" as one "prepared by two or more authors with the intention that their contribution be merged into inseparable or interdependent parts of a unitary whole."[11] 17 U.S.C. § 101. Components

10. The question of whether the illustrations Shuster provided for *More Fun Comics* no. 101 were in fact prepared as a work made for hire is not argued in the parties' papers. This is understandable given Shuster or his heirs failure to join in or file separately a notice of termination related to either the Superman or Superboy copyright. Given that the time to exercise the termination right has passed, ownership over Shuster's half of the copyrights reverts to defendants.

11. Nimmer in his treatise has commented that the 1976 Act's definition for a "joint work" actually defines "joint authorship" and is simply designated incorrectly in the Act. 1 Nimmer on Copyright § 6.01 at 6–3. Regardless, courts have utilized the statutory definition for "joint works" in delimiting the parameters of whether someone was a joint author of a copyright. *See Aalmuhammed v. Lee,* 202 F.3d 1227, 1231 (9th Cir.2000).

of a unitary work are "inseparable" when they have little or no meaning standing alone, such as paragraphs in a novel, and the components are considered "interdependent" when they could stand alone but achieve a greater effect when combined, such as the lyrics and melody of a song. *See* H.R.Rep. No. 94–1476, at 120 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5736. Here, the copyright to Superboy (if a joint work) would be considered comprised of interdependent parts—Siegel's dialogue and storyline (as contained in his submissions) and Shuster's artwork giving life and color to those words. The parties do not dispute that Shuster's illustrations for the Superboy comic released in *More Fun Comics* would otherwise qualify for joint authorship status. Anyone looking at the Superboy comic contained in that magazine would know that it owed its existence to both Shuster's illustrations and Siegel's words (assuming that the submissions were published in *More Fun Comics,* no. 101). *See Aalmuhammed,* 202 F.3d at 1232 ("It is ... easy to apply the word ['author'] to two people who work together in a fairly traditional pen-and-ink way, like, perhaps, Gilbert and Sullivan. In the song, 'I Am the Very Model of a Modern Major General,' Gilbert's words and Sullivan's tune are inseparable, and anyone who has heard the song knows that it owes its existence to both men, Sir William Gilbert and Sir Arthur Sullivan, as its creative originator").

Rather, the central question with respect to the joint authorship issue in this case is whether Siegel prepared the Superboy submissions with the knowledge and intent that the comic strip would be a joint work, with Shuster providing illustrations to the comic strip if it were published. As far as the joint preparation and intention of the authors, the Senate Committee Report submitted with the passage of the 1976 Act states as follows:

[A] work is "joint" if the authors collaborated with each other, or if each of the authors prepared his or her contribution with the knowledge and intention that it would be merged with the contributions of other authors as "inseparable or interdependent parts of a unitary whole." The touchstone here is the intention, at the time the writing is done, that the parties be absorbed or combined into an integral unit....

S.Rep. No. 94–473, at 103 (1975).

Here, the referee's findings make clear that Shuster had collaborated in the past on all the other comic strips conceived by Siegel; he did the illustrations for not only Superman, but for Siegel's other comic strip incantations, such as The Spy and Slam Bradley. With respect to Superboy, however, the two did not engage in the usual collaborative effort of the past. Siegel submitted the conception, including a script of the dialogue, for the Superboy comic to Detective Comics, but then a four-year hiatus occurred before Shuster drew the illustrations for the same. When Shuster created those illustrations, Siegel was abroad serving in the military. There is absolutely no information submitted by the parties or contained in the referee's findings suggesting that Siegel brainstormed with Shuster in their studio when drafting his Superboy submissions.

However, contemporaneous and coordinated action between Siegel and Shuster is not required. As Judge Learned Hand explained, "it makes no difference whether the authors work in concert, or even whether they know each other; it is enough that they mean their contributions to be complimentary in the sense that they are to be embodied in a single work...." *Edward B. Marks Music Corp. v. Jerry Vogel Music Co.,* 140 F.2d 266, 267 (2nd Cir.1944). That said, there are indications that, when Siegel created the Superboy

submissions, he envisioned those submissions as part of a unitary comic strip incorporating Shuster's artwork. The proposed script Siegel submitted for the Superboy comic itself, in the same way as all the other Siegel and Shuster comics were presented, contained the by-line crediting its authorship to "Jerry Siegel and Joe Shuster." Such shared billing in Siegel's submission is strong evidence of the intent to create a joint work. *See Aalmuhammed*, 202 F.3d at 1234 ("putative coauthors make objective manifestations of a shared intent to be coauthors, as by denoting the authorship of *The Pirates of Penzance* as 'Gilbert and Sullivan' "); *Childress v. Taylor*, 945 F.2d 500, 508 (2nd Cir.1991).

Moreover, the audience appeal of Siegel's Superboy, as with all the other comic strips he helped conceive, was tied to Shuster's contribution of the illustrations. *See Aalmuhammed*, 202 F.3d at 1234 (citing as an objective manifestation of parties' mutual intent to create a joint work as whether "the audience appeal of the work turns on both contributions"). Superboy's appeal to the public was not only in reading the harrowing tales of the superhero's exploits but also in the colorful imagery Shuster provided to grip the reader's imagination. *See generally Maurel v. Smith*, 220 F. 195, 200 (S.D.N.Y.1915) (Learned Hand, J.) (characterizing the separately provided dialogue, plot, and music contributions to a comedic opera as being "like mosaics from which, though you may lift a stone, it loses the significance of its setting"). This evidence also supports a conclusion that Superboy was intended as a joint work. *See Aalmuhammed*, 202 F.3d at 1234.

Plaintiffs make no effort to deny that any of this objective evidence would otherwise lead to the conclusion that Siegel's Superboy submissions were envisioned by Siegel as part of a unitary work comprised with Shuster's illustrations. Instead, their argument is more nuanced.

First, they seek to side-step the issue by arguing that the referee's finding that Siegel was "the originator and sole owner" of Superboy forecloses further discussion of whether the copyright to the creation of the same was a joint work. Plaintiffs' reliance on the referee's finding is misplaced. The referee was simply signifying that, as between Siegel and Detective Comics, Siegel was the sole owner and originator to the same. The question (and the ramifications flowing from the same) as to Shuster's authorship of the Superboy material was not presented to the referee to decide. Plaintiffs make mention that Detective Comics noted in its answer filed in the Westchester action that "substantial artwork for said comic strip entitled 'SUPERBOY' was performed by ... SHUSTER and paid therefor by" Detective. (Reply Decl. Marc Toberoff in Supp. Mot. Partial Summ. J., Ex. A ¶ 14 at 6). Plaintiffs read into this averment that Detective Comics was seeking to utilize Shuster's illustrations as a basis to lay claim to partial ownership in Superboy itself, by labeling Shuster's contribution as a work for hire. The Court disagrees with this reading. To begin, the Second Circuit in *Siegel* held that the work for hire issue was not litigated in the Westchester action. 508 F.2d at 914 ("That issue was not litigated at all in the state court"). If the issue was not litigated directly before the referee, it certainly was not done indirectly through the guise of a joint authorship argument, which itself was predicated upon there being a work made for hire. Moreover, the averment in question was interposed by Detective Comics in connection with Siegel *and* Shuster's fourth cause of action. (*Id.* ¶ 14 at 5) ("Deny each and every allegation contained in paragraphs 'THIRTY–SIXTH', 'THIRTY–SEVENTH', 'THIRTY–EIGHTH', and 'THIR-

TY–NINTH' of the complaint"). The fourth cause of action was plaintiffs' alternative claim for "the wrongful publication" of Superboy in which it argued that its "plot, conception and incidents were based upon and copied from the plot, conception and incidents of the plaintiff's comic strip *Superman*" (which the complaint argued in the first two causes of action belonged to Siegel and Shuster), and further argued that Detective Comics mislead the public into believing that Siegel was "the author of the continuity dialogue and action of each of the individual releases" for Superboy by affixing his name to the strip as its author. (Defs' App. of Docs. in Supp. Mot. Recons., Ex. 7 ¶¶ 36–37, at 10). It was in this context that Detective Comics sought to divine meaning from Shuster's illustrations and their payment for the same to him. Detective Comics stated in its answer that those facts indicated Shuster's tacit consent to the publication of Superboy (thereby negating that Detective Comics utilized Superman elements without the plaintiffs' consent, as one of the purported co-owners of Superman approved said publication) and also as constituting approval for the publisher to use Siegel and Shuster's by-line on the comic strip. (Reply Decl. Marc Toberoff, Ex. A ¶ 14, at 6) ("affixing of the name of plaintiff SIEGEL to some of said 'SUPERBOY' releases was with the knowledge and approval of plaintiff SHUSTER"). Thus, defendants' noting that Shuster had done the illustrations for the Superboy illustrations and paid for the same had nothing to do with the work made for hire nature of that contribution; rather, it merely countered the factual allegations in plaintiffs' fourth cause of action.

Nothing submitted by the parties conclusively shows the purpose for Detective Comics' representation that Shuster provided the illustrations for the comic was otherwise. Indeed, plaintiffs themselves note that Detective Comics' recitation of Shuster's participation signified that it "claimed *or could have claimed* in the 1947 Action that they co-own 'Superboy' by virtue of co-owning the artwork." (Pls' Reply in Supp. Mot. Partial Summ. J. at 16 (emphasis added)). This tacit admission by plaintiffs undercuts their argument that, in making the finding that Siegel was the originator and "sole owner" of Superboy, the referee *did find* that Shuster was not a joint author of the work. Undoubtedly, were this Court to hold that Superboy was a "joint work" between Siegel and Shuster, this would effectively undermine the referee's finding that Siegel was the "sole owner" of Superboy and could, assuming that Shuster's artwork is considered a work for hire, negate the injunction the referee placed against Detective Comics from exploiting Superboy. That this would be the result from such a ruling does not mean that the referee therefore must have considered and ruled on any potential question that could unravel his decision. Rather, it simply underscores the potential pitfalls in litigating cases that touch on the subject matter of copyright in state court, a forum where not all the issues that could impact rights to a copyright are, or can, be litigated.

Switching gears, plaintiffs next argue that, regardless of whether or not Siegel intended for his material to be part of a joint work with Shuster, this intention was fundamentally altered when Detective Comics later published his material without his consent. (Pls' Reply in Supp. Mot. Partial Summ. J. at 17–18). Plaintiffs argue that consent to publication is necessary for the material to be treated as a joint work. The Court disagrees. What the case law does suggest is that a contributor's consent is required for the use or inclusion of his or her material as part of a joint work, but not that, absent a contractual provision to the contrary, his or her consent to publication of the joint work is

required once that author has already intended for the material to be part of a joint work. In each of the cases cited to by plaintiffs, the consent issue addressed was the author's consent for his or her material to be used in a joint work, not consent to the joint work's later publication.

In *Szekely v. Eagle Lion Films, Inc.,* 242 F.2d 266 (2nd Cir.1957), a license-holder approached Szekely to write the screen play based on a novel for which the license-holder had the motion picture rights. *Id.* at 267. The parties' contract contained a provision contemplating that there may be a need for collaboration on Szekely's screenplay, but conditioned such collaboration on Szekely's consent. *Id.* at 268. Furthermore, the parties' contract specifically provided that "all rights and title in the manuscript [were] to remain in Szekely until he received the agreed minimum compensation for his effort [of] $35,000." *Id.* at 267. The movie producer never paid Szekely the minimum compensation required under the contract, even after he "presented the final draft of his script," informing Szekely "that his screen play was not being used in the movie." *Id.* The movie producer's statement to Szekely was false. Instead, owing to financial constraints, the movie producer, without any notification to or obtaining of consent from Szekely, found another screenwriter to make revisions to Szekely's script, presumably for an amount less than that owed to Szekely under the contract. *Id.* After the movie was finished and released for distribution, Szekely sued, arguing that his rights to script were infringed. Defendants argued that Szekely "was merely a joint owner" with the other screenwriter, and that screenwriter's subsequent license of his rights to the script to the film producer entitled him to publish it without Szekely's consent. *Id.* at 268.

The Second Circuit disagreed. The court noted that the other screenwriter's "adaptation of [Szekely's] screen play ... was not contemplated at the inception of the work, which was not planned as a joint work." In fact, Szekely specifically contracted with the movie producer that such collaboration (which could transform his screenplay into a joint work) could only happen "on [Szekely's] consent, which was not sought or obtained" before the other screenwriter was brought in to revise Szekely's screenplay. *Id.* The rule to be drawn from *Szekely* is simply that consent to inclusion of an author's separate material into a joint work is necessary; where the author never intended for his material to be part of a joint work, he retains the rights to that material, particularly where, as in *Szekely,* there exists a contractual provision requiring the author's consent before adaption or other contribution to his material can occur. Those circumstances are not present here. When Siegel prepared his Superboy submissions, he clearly contemplated Shuster's contribution of artwork to his material. Moreover, there is absolutely no evidence presented by the parties or contained in the referee's findings demonstrating an understanding or arrangement between Siegel and Shuster that such prior consent was necessary before the other contributed his material to their comic strips.

Plaintiffs argue that to hold that Superboy was a joint work would be for the Court to sanction a publisher's theft of an author's work without fear of copyright infringement "so long as the author initially intended that his work be included in a joint or collective work." (Pls' Reply in Supp. Mot. Summ. J. at 17). Plaintiffs' argument collapses two different concepts, and ignores the consequences flowing from the fact that Siegel intended from the beginning for his Superboy submissions to be part of a joint work. Whether Detective

Comics (or its successors in interest) should fear a suit for infringement of Siegel's material turns exclusively on the heretofore unlitigated question of whether Shuster's artwork was a work made for hire. Absent a finding that this was so, Detective Comics would remain liable for its publication of Superboy in *More Fun Comics,* no. 101 and subsequent thereto (assuming, of course, that the strip in *More Fun Comics* published the copyrightable material, if any, in Siegel's Superboy submissions). The absolution plaintiffs seek to give to Detective Comics from an infringement claim is thus premature. Similarly, the "theft" spoken of by plaintiffs is puzzling. Siegel intended all along to share the profits realized from his contribution to Superboy, the only difference being that he thought he would be sharing those profits with Shuster and now he (or rather his heirs) may have to share it with Detective Comics (or rather its successors). The only party who could possibly be seen as having something stolen would be Shuster. Indeed, were the Court to hold that *Siegel* alone is entitled to the copyright to and all the profits realized from Superboy because of Detective Comics' "theft" from *Shuster,* the Court would be placing Siegel—the party whose copyright rights were unaffected by the publisher's conduct—in a superior position than that which even he envisioned to possess, all to the denigration of the contribution (and the rights thereto) Shuster supplied to the joint work.

The one factor preventing the Court from finding that Siegel's Superboy submissions were contributions to a joint work with Shuster's illustrations in the Superboy comic is the unresolved issue (*see infra* III.D.) of whether there was in fact any original copyrightable material in Siegel's Superboy submissions. The rule in this circuit is that something is a joint work only if each contribution to that work, standing alone, was independently copyrightable material. *See Ashton–Tate Corp. v. Ross,* 916 F.2d 516, 521 (9th Cir. 1990) ("joint authorship requires each author to make an independently copyrightable contribution"); *but see Gaiman v. McFarlane,* 360 F.3d 644, 658–59 (7th Cir. 2004) (refusing to apply above rule to situations "where two or more people set out to create a character jointly in such mixed media as comic books and motion pictures and [through their efforts] succeed in creating a copyrightable character"); 1 Nimmer § 6.07[A][3][a], at 6–22 ("if authors A and B work in collaboration, with A contributing sparkling plot ideas and B weaving them into a completed screenplay, it cannot be doubted that both have made more than a *de minimis* contribution to the resulting script. On that basis, both A and B should be considered joint authors of the work even though, standing alone, plot ideas may not be copyrightable"). At a minimum, there must be some copyrightable material in Siegel's Superboy submissions, otherwise that material could not have formed a predicate contribution to render Superboy a joint work. If, however, the Court were to find that those submissions were completely derivative of Superman, then there was no independently copyrightable material within those submissions and Superboy is not a joint work.

## C. *Publication*

"Under the 1909 Act, it was necessary to publish the work with proper notice to obtain copyright [protection]." *Stewart,* 495 U.S. at 233, 110 S.Ct. 1750; *see also* 17 U.S.C. § 10 (repealed) ("Any person entitled thereto by this title may secure copyright for his work by publication thereof with the notice of copyright required by this title"). Publication was an important concept under the 1909 Act as the act of publication "constituted the dividing line between" common law copyright protected under state law and statutory copyright

protected under federal law; publication of the work by itself divested an author of common law copyright protection, leaving the federal copyright statute as the only means to keep the work from becoming a part of the public domain. *See Stewart,* 495 U.S. at 233, 110 S.Ct. 1750 ("Publication of a work without proper notice automatically sent a work into the public domain"). "The concept of publication was of immense importance under the 1909 Act. It became a legal word of art, denoting a process much more esoteric than is suggested by the lay definition of the term." 1 Nimmer § 4.01, at 4–3.

Although this line of demarcation was erased with the 1976 Act's pre-emption of common law copyright, *see* 17 U.S.C. § 301, the concept retains importance even under the 1976 Act. Specifically, section 304(c) only grants the right to terminate earlier grants to those "copyright[s] subsisting in either its first or renewal term on January 1, 1978." The only copyright subsisting in either its first or renewal term before the effective date of the 1976 Act were those protected under the 1909 Act, that is, those that had been published (as opposed to unpublished material protected by state common law) and registered. *See* 3 Nimmer § 11.02[A][1] at 11–12 ("the termination provisions of Section 304(c) apply only if the work in question was the subject of statutory copyright prior to the effective date of the current Act").

The 1909 Act, unlike the present governing statute, contained no definition for when a work was considered "published." Nonetheless, the definition for publication contained in section 101 to the 1976 Act is seen as generally codifying the meaning of the concept as developed by the case law under the 1909 Act. *See* 1 Nimmer § 4.04, at 4–20.1 (observing that the 1976 Act's definition for publication "in general constitutes a codification of the definition evolved by case law prior to adoption of the present Act"). The 1976 Act defined "publication" as "the distribution of copies ... of a work to the public by sale or other transfer of ownership...." Thus, under the 1909 Act publication occurred "when by consent of the copyright owner the original or tangible copies of a work are sold ... or otherwise made available to the general public." 1 Nimmer § 4.04 at 4–21.

Defendants contend that Siegel's Superboy submissions "were never [separately] published or registered as unpublished works as of January 1, 1978." (Defs' Opp. to Pls' Mot. Partial Summ. J. at 20). Plaintiffs counter that the copyrightable material contained in Siegel's Superboy submissions were later "published" in the Superboy comic strip found in volume 101 of Detective Comics' *More Fun Comics,* to which Detective Comics contemporaneously registered a copyright. The copyright to the magazine, it is contended, secured statutory copyright protection to all its constituent parts, namely all the comic strips contained in that volume of the magazine including Superboy. *See Self–Realization,* 206 F.3d at 1329 ("A blanket copyright on a periodical protects its constituent parts"); *see also Batjac Prods., Inc. v. GoodTimes Home Video Corp.,* 160 F.3d 1223, 1233–35 (9th Cir.1998) (holding that, to the extent copyrightable material in an unpublished work "is incorporated" in a published derivative work based thereon and actually becomes a "component" thereof, it will be considered published by the later work). Defendants do not dispute this legal point, but argue that none of the copyrightable material contained in Siegel's Superboy submissions (assuming that there were any contained therein) was printed in the Superboy comic strip published in volume 101 to *More Fun Comics.* The point raised by defendants' argument stems from the fact that the Superboy comic strip in *More Fun*

*Comics* no. 101 does not track verbatim the script, dialogue or storyline contained in Siegel's Superboy submissions, in particular his 1940 proposed script. Given the discrepancy between the two, the question becomes not so much whether Detective Comics' issuance of *More Fun Comics* no. 101 constituted a publication, as it clearly did, but whether any of the copyrightable material in Siegel's Superboy submissions was published through the same.

Plaintiffs argue that the question of publication was conclusively determined by the referee's finding that Detective Comics' "comic strip release entitled SUPERBOY published [in *More Fun Comics* no. 101] in December of 1944 embodied and was based upon the idea, plan and conception contained in" Siegel's Superboy submissions. The problem for plaintiffs is that the referee's factual finding does not go far enough. The referee's findings do not stand for the proposition that everything (copyrightable or otherwise) contained in Siegel's Superboy submissions was reprinted in *More Fun Comics* volume 101, but, instead, only that the Superboy comic in *More Fun Comics* made concrete the "idea, plan and conception" for a Superboy comic that was pitched and elaborated upon in Siegel's submissions. This distinction is important as an "idea" as such is not copyrightable, either under the 1909 Act or the 1976 Act. *See National Comics Publications, Inc. v. Fawcett Publications, Inc.*, 191 F.2d 594, 600 (2nd Cir.1951) ("a copyright never extends to the 'idea' of the 'work,' but only to its 'expression,' and that no one infringes, unless he descends so far into what is concrete as to invade that 'expression' "). Thus, the referee's finding leaves unanswered the critical point for purposes of the question in this case: Whether any of the copyrightable material in Siegel's Superboy submissions was in fact later published. Because the question of whether and to what extent any copy-

rightable material was contained in Siegel's Superboy submissions remains to be determined (*see infra* III.D.), the Court is in no position at this time to make a final determination whether said material, however characterized, was published in *More Fun Comics* no. 101.

## D. *Derivative Work*

Section 7 to the 1909 Act discussed derivative works as being the "[c]ompilations or abridgements, adaptations, arrangements, dramatizations, translations, or other versions of works in the public domain or of copyrighted works when produced with the consent of the proprietor of the copyright in such works, or works republished with new matter," and treated such additional material "as new works subject to copyright...." 17 U.S.C. § 7 (repealed); *see also Stewart*, 495 U.S. at 231, 110 S.Ct. 1750 (observing that section 7 to the 1909 Act signified "the types of works that may be derivative works"). Thus described, a derivative work is "any work based in whole, or in substantial part, upon a pre-existing work, if it satisfies the requirements of originality ... and is not itself an infringing work, [and] will be separately copyrightable." 1 Nimmer § 3.01, at 3–3. If an author contributes additional original material to a pre-existing work so as to recast, transform or adapt that work, then that additional material is subject to copyright protection, that is, it is a protectable derivative work. *See id.* § 3.03, at 3–10; *see also Asia Entertainment Inc. v. Nguyen*, 40 U.S.P.Q.2d 1183, 1185 (C.D.Cal.1996). The resulting work need not be a qualitative improvement over the prior work; rather, what is necessary is that "the additional material injected in a prior work, or the manner of rearranging or otherwise transforming a prior work, must constitute more than a minimal contribution." *Id.* at 3–11; *see also Feist Publications, Inc. v. Rural Tel.*

*Serv. Co.*, 499 U.S. 340, 348, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991); *Grove Press, Inc. v. Collectors Publication, Inc.*, 264 F.Supp. 603 (C.D.Cal.1967). "[T]he applicable standard in determining the necessary quantum of originality is that of a 'distinguishable variation' that is more than 'merely trivial.' Any variation will not suffice, but one that is sufficient to render the derivative work distinguishable from its prior work in any meaningful manner will be sufficient." 1 Nimmer, at 3–12 to 3–13.

Defendants contend that Siegel's Superboy submissions are almost completely derivative of Superman, contain no original copyrightable element within them, and, therefore, are not a protectable derivative work. (Defs' Opp. to Pls' Mot. Partial Summ. J. at 24 ("derivative works based upon and incorporating pre-existing Superman elements and ideas that were previously published")). To defendants, "the submissions are based upon and, indeed dominated by, pre-existing, published Superman elements ... previously published by Detective at the time the works were submitted by Siegel." (Defs' Mot. Summ. J. at 12). When these pre-existing elements are removed from Siegel's submissions, all that is left, according to defendants, is the unelaborated concept of Superman as a youth, or as plaintiffs deride it, " 'Superboy' is merely 'Superman' in smaller tights." (Pls' Reply in Supp. Mot. Partial Summ. J. at 1). Viewing this singular additional material to be merely trivial and insufficiently distinguishable, defendants argue that there is no copyrightable material within Siegel's Superboy submissions.

Plaintiffs again respond by pointing to the referee's findings as conclusively establishing that Superboy is not a completely derivative work. In particular, plaintiffs note the referee's observation in his November, 1947, opinion: "I cannot accept defendants view that Superboy was in reality Superman.... Superboy was a separate and distinct entity"; this finding, plaintiffs argue, is fundamentally inconsistent with a finding that Siegel's Superboy submissions is completely a derivative work. (Pls' Reply in Supp. Mot. Partial Summ. J. at 18). Plaintiffs characterize the referee's statement as a conclusion that Siegel's Superboy submissions were "sufficiently new and original to constitute a distinct work from Superman." (*Id.* at 19). Bolstering their view is the referee's separate finding that Superman "did not contain the plan, scheme, idea or conception of the comic strip Superboy."

The problem with this argument is twofold. First, such a pure finding relating to copyright law—that Superboy is not a "derivative work" under the 1909 Act—would, for the reasons set forth above, be well beyond the referee's jurisdiction to make. There was no state law claim requiring consideration of whether there was any original elements contained in Siegel's Superboy submissions. More importantly, the Court finds nothing in the referee's findings and conclusions relied upon by plaintiffs that would preclude litigation in this proceeding concerning the derivative nature, if any, of Siegel's Superboy submissions pursuant to federal copyright law.

Although at first glance the referee's findings may appear to speak directly and conclusively to the issue of whether Superboy is a derivative work, upon further assessment that is not necessarily the case. One must remember the context in which the referee's statement was made: The question for the referee to resolve was whether Superboy was part and parcel of Superman for purposes of whether the first refusal rights contained in the parties' September, 1938, agreement were implicated. The question resolved by the referee was a matter of contract interpretation—what did the parties mean when

they used the phrase "Superman" in their contract—not whether Superboy contained any original elements worthy of copyright protection. That Siegel's Superboy was distinct from Superman (even assuming that the referee was speaking beyond the confines of the narrow contract claim in dispute before him and making a larger observation of the two characters' separateness) does not inform this Court's decision as to whether that which made Siegel's Superboy distinct for purposes of interpreting their contract is also original (or more particularly, more than a merely trivial variation from Superman) as that term is understood in federal copyright law so as to render Siegel's creation subject to copyright protection. In addition, even more problematic is the fact that the referee nowhere identifies in what way or manner Siegel's Superboy is distinct from Superman, such differentiation forming the subject of any copyrightable material in this case.

By way of further argument, plaintiffs seek to describe, in the most general of ways, the additional material supplied by Siegel:

> Siegel's "Superboy" focuses on the character, family and social life of a youth growing up in a small rural town who faces the challenges of adolescence while repressing who he really is. Siegel's story is primarily devoted to the close relationship between "Superboy" and his earnest adoptive parents, and follows "Superboy's" small town adventures with his school classmates and townsfolk.... "Superboy" [is] a sufficiently original and distinct character and story from "Superman" to warrant independent copyright protection.

(Pls' Reply in Supp. Mot. Partial Summ. J. at 19, 20).

From this description it appears to the Court that, in addition to any argument that Superboy himself (or perhaps Ma and Pa Kent) was a separate copyrightable character, plaintiffs also argue that certain plot lines contained in Siegel's script were sufficiently distinct as to warrant separate copyright protection. (Pls' Opp. to Defs' Mot. Summ. J. at 12 ("The new elements in 'Superboy' authored by Siegel, including the themes, characters, relationships, mood, settings, locale and the interplay of such elements, are squarely protected by the Copyright Act")).

The Court is mindful that plaintiffs have never claimed that Siegel's Superboy is not derivative of Superman. Instead, they argue that his submissions contained original additional material that is itself entitled to copyright protection. (Pl's Opp. to Defs' Mot. Summ. J. at 11–12 ("Plaintiffs have *never* claimed that 'Superboy' is 'unrelated' to 'Superman' or that 'the Superboy character has nothing to do with the Superman character")). The problem the Court has with the parties' briefing on this issue is that, aside from seeking to delineate the "additional" material supplied by Siegel in his submissions, neither side has attempted to demonstrate how that material (whatever it may be, either by itself or when viewed as a whole) was more than a trivial variation from the pre-existing material in Superman, other comic book characters in general, or even more broadly with other fictional characters.

The Court, for example, has been presented with no evidence addressing whether *other adolescent superhero comic book* characters existed before Siegel conceived of Superboy in his submissions. Defendants make mention of a couple of panels in earlier Superman comic books where Superman was shown as an infant, but nowhere have they pointed to comic strips where the storyline delineating this aspect of the Superman character had been so fleshed out as to comprise part of the pre-existing work.

Case law under the 1909 Act speaks to the issue of originality in the context of fictional characters in general and Superman in particular. The controlling principle was stated by Judge Learned Hand long ago when he added that fictional characters may be protected by copyright "quite independently of the 'plot' proper," but added such characters must be sufficiently developed beyond "stock characters" to obtain protection:

> Upon any work ... a great number of patterns of increasing generality will fit equally well, as more and more incident is left out. The last may perhaps be no more than the most general statement of what the play is about, and at times might consist only of its title; but there is a point in this series of abstractions where they are no longer protected....
> If Twelfth Night were copyrighted, it is quite possible that a second comer might so closely imitate Sir Toby Belch or Malvolio as to infringe, but it would not be enough that for one of his characters he cast a riotous knight who kept wassail to the discomfort of the household, or a vain and foppish steward who became amorous of his mistress. These would be no more than Shakespeare's "ideas" in the play, as little capable of monopoly as Einstein's Doctrine of Relativity or Darwin's theory of the Origin of Species. It follows that the less developed the characters, the less they can be copyrighted; that is the penalty an author must bear for making them too indistinctly.

*Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2nd Cir.1930).

By the same token, the less developed a character in a prior work, the more room for the addition of material that will comprise more than a trivial variation from that character and, hence, be subject to copyright protection. Thus, the relevant question is how much, and to what extent, had the Superman character been fleshed out by the time Siegel submitted his Superboy material to Detective Comics. A decision by the Second Circuit concerning the Superman copyright contemporaneous with Siegel's submissions, *Detective Comics, Inc. v. Bruns Publications, Inc.*, 111 F.2d 432 (2nd Cir.1940), sheds some light on the matter. There the court described the protectable elements of the Superman character as:

> "a man of miraculous strength and speed ... [who] at times conceals his strength beneath ordinary clothing but after removing his cloak stands revealed in full panoply in a skin-tight acrobatic costume.... [He] is termed the champion of the oppressed. [He] is shown running toward a full moon 'off into the night,' and ... is shown crushing a gun in his powerful hands. 'Superman' is pictured as stopping a bullet with his person.... 'Superman' is shown as leaping over a twenty story building ... [and is] endowed with sufficient strength to rip open a steel door. [He] is described as being the strongest man in the world and ... as battling against 'evil and injustice.'"

111 F.2d at 433; *see also National Comics Publications, Inc. v. Fawcett Publications*, 191 F.2d 594, 600 (2nd Cir.1951) (Learned Hand, J.) (describing earlier decision in *Bruns Publishing* as "limit[ing] the copyright to the specific exploits of 'Superman,' as each picture portrayed them"). It is thus the character's traits and attributes, as well as the character's interaction with other characters (notably compatriots and villains), that help define the boundaries of the copyright to a character. As Nimmer has observed in his treatise, "a visual similarity (although not completely identical in appearance) plus a similarity in character traits, may prove sufficient to constitute an infringement, even where the names of the plaintiff's and defendant's characters differ." 1 Nimmer § 2.12, at 2–178.29 to 2–

178.30; *see also Warner Bros. v. American Broadcasting Cos.*, 720 F.2d 231, 241 (2nd Cir.1983); *Sapon v. DC Comics*, 62 U.S.P.Q.2d 1691 (S.D.N.Y.2002) (examining whether author's additional material was sufficiently original as to be considered a protectable derivative work of Batman).

Given the factually intensive nature of the question, and the lack of elaboration in the parties' briefs on the topic, the Court finds that the better course at this point is to allow the parties an opportunity to more fully explore and provide their positions as to the derivative nature, if any, of Siegel's Superboy submissions, bearing in mind the legal principles set forth in *Nichols* as expounded in *Bruns Publications, Warner Bros*, and *Sapon.*

Accordingly, the Court finds that Siegel's Superboy submissions were not a work made for hire. However, for the reasons set forth above, the Court finds that it cannot, at this stage, make a determination whether Siegel's Superboy submissions were completely derivative of Superman or, if not, to what extent those submissions contained additional, original copyrightable material. Without resolving this point, the Court cannot make a corresponding finding whether Siegel's Superboy submissions were published in volume 101 of *More Fun Comics* or whether those submissions were contributions to a joint work with Shuster. Given the critical nature of the derivative work issue to this case, the Court hereby **ORDERS** that the parties submit simultaneous competing briefs within thirty (30) days from the date of this Order concerning that issue, and that issue alone.

## IV. CONCLUSION

As set forth herein, the Court **GRANTS** defendants' motion for reconsideration. Consistent with this holding, the Court **VACATES** the following portions of the March 23, 2006, Order: Page 4, line 23 through page 12, line 5; page 14, line 2 through page 14, line 20; and page 15, line 1 through page 15, line 6. The portion of the March 23, 2006, Order denying defendants' motion for summary judgment on the question of infringement remains in effect. The Court also **VACATES** the portions of the plaintiffs' statement of facts, entered on March 27, 2006, that are inconsistent with this Order.

The Court finds that the referee's findings from the 1947 Westchester County action must be given preclusive effect pursuant to the doctrine of collateral estoppel. Based on the referee's findings, the Court has determined that Siegel's Superboy submissions were not a work made for hire, but the Court is unable to conclude whether the requisite "publication" of the Superboy submissions occurred due to the unresolved matter regarding the submissions' derivative nature. Similarly, the Court was unable to conclude whether the Superboy submissions were part of a joint work, but only because the issue of whether the submissions are a derivative work remains unresolved (and a subject of further court-ordered briefing).

IT IS SO ORDERED.